544

993 A.2d 805

PHILIP A. BESLER AND JENNIFER J. BESLER, PLAINTIFFS–RESPONDENTS, AND CAROLANN S. BESLER, PLAINTIFF, v. BOARD OF EDUCATION OF WEST WINDSOR–PLAINSBORO REGIONAL SCHOOL DISTRICT, BODY CORPORATE ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF NEW JERSEY, AND/OR ITS SERVANTS, AGENTS AND EMPLOYEES, DANIEL HUSSONG, MICHAEL CARR, AND RAY J. BANDLOW, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY; INDIVIDUALLY, JOINTLY AND SEVERALLY, DEFENDANTS–APPELLANTS, AND LORI HUSSONG AND ROBERT BANKS, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY; TOWNSHIP OF PLAINSBORO, A MUNICIPAL CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF NEW JERSEY, AND/OR ITS SERVANTS, AGENTS AND EMPLOYEES, JOHN J. LOMELA AND RICHARD FURDA, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY; AND TOWNSHIP OF LONG BEACH, A MUNICIPAL CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF NEW JERSEY, AND/OR ITS SERVANTS, AGENTS AND EMPLOYEES, AND MATTHEW PETERSON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; INDIVIDUALLY, JOINTLY AND SEVERALLY, DEFENDANTS.

Argued September 29, 2009—Decided May 17, 2010.

Justice Rivera–Soto, J., concurred in part, dissented in part, and filed opinion, in which Hoens, J., joined.

546

550

*Sharon H. Moore,* argued the cause for appellants (*Gebhardt & Kiefer,* attorneys; *Ms. Moore* and *Leslie A. Parikh,* on the briefs).

*Daniel C. Fleming,* argued the cause for respondents (*Wong Fleming,* attorneys; *Mr. Fleming, Mark W. Thompson,* and *Linda Wong,* on the briefs).

*Carl Tanksley, Jr.,* argued the cause for amicus curiae New Jersey School Boards Association (*Cynthia J. Jahn,* Assistant Executive Director, attorney).

Justice ALBIN delivered the opinion of the Court.

During the public comment period of a meeting of the Board of Education of the West Windsor–Plainsboro Regional School District (Board), the Board President denied plaintiff Philip Besler the opportunity to complete a statement critical of both Board policy and a high school coach he believed had verbally abused student-athletes, including his daughter. Besler filed a federal civil rights claim pursuant to 42 *U.S.C.* § 1983, alleging that he was entitled to express his grievances at the meeting—a public forum—and that the Board violated his free-speech rights guaranteed by the First Amendment. A jury found that the Board did not have a "compelling" reason to justify silencing Besler and awarded him monetary damages in the amount of $100,000. The Appellate Division affirmed.

In this appeal, the Board contends that the singular actions of its Board President did not make it liable for any claimed First

Amendment violation under 42 *U.S.C.* § 1983. The Board also argues that the evidence at trial was insufficient to support the jury's verdict. The Board maintains that the evidence supported only one conclusion—that it was enforcing a content-neutral policy of curtailing repetitive remarks for the purpose of conducting an orderly public meeting. Last, the Board urges that we overturn the damages award as excessive.

First, we find that, for purposes of 42 *U.S.C.* § 1983, the Board President was acting as a final policymaker while presiding over the public comment period of the Board meeting and therefore the Board could be held liable for a violation of Besler's First Amendment rights. Second, we hold that Besler presented sufficient evidence for the jury to determine that the Board silenced him for no reason other than the unpopular viewpoint he expressed. We thus must respect the jury's finding that the Board violated Besler's free-speech rights.

Finally, Besler offered only minimal evidence of emotional distress—transient embarrassment and humiliation as a consequence of the abrupt manner in which he was prevented from completing his remarks. We conclude that the damages award is so clearly excessive that it constitutes a miscarriage of justice and therefore remand to the trial court for a remittitur or, alternatively, a new trial on damages.

I.

A.

In January 1998, Philip Besler, his wife Carolann, and daughter Jennifer filed a twelve-count complaint in the Superior Court, Law Division of Mercer County, naming as defendants the Board of Education of West Windsor–Plainsboro Regional School District, the girls high school basketball coach, the District's Superintendent, the high school Principal, and others. Only one of the twelve counts dealt with Mr. Besler's claim that he was denied his First Amendment rights when silenced at the January 28, 1997

Board of Education meeting. In that count, the Board was the only named defendant. The remaining eleven counts addressed various other claims—that the basketball coach, Daniel Hussong, verbally abused and harassed Jennifer, that the District was blindly indifferent to her plight, and that the police retaliated against the Beslers for the complaints they raised with the District. The complaint specifically alleged violations of the federal and state constitutions, the Law Against Discrimination, *N.J.S.A.* 10:5-1 to -49, Title IX, 20 *U.S.C.* §§ 1681 to 1688, as well as common law claims of negligent supervision, intentional infliction of emotional distress, and false imprisonment.

A jury trial was conducted between December 2003 and March 2004 encompassing thirty-two days of testimony from more than fifty-five witnesses.[1] Only a fraction of the testimony concerned Mr. Besler's First Amendment claim.

### B.

The Board appeals from the trial court's denial of its motion for judgment notwithstanding the jury's verdict. At this procedural stage, we must view the evidence in the light most favorable to Mr. Besler. *Lewis v. Am. Cyanamid Co.,* 155 *N.J.* 544, 567, 715 *A.*2d 967 (1998).

The jury heard that Philip Besler began attending and speaking at School Board meetings in the spring of 1996 as a concerned parent and citizen. His daughter, Jennifer, then a senior at West Windsor–Plainsboro High School and member of the girls varsity basketball team, claimed that her basketball coach, Daniel Hussong, repeatedly verbally abused her and other team members. Jennifer asserted that Hussong singled her out for particularly

---

[1] Nine of the twelve counts were dismissed either on summary judgment or on motion for a judgment at the conclusion of plaintiffs' case. At some point, the complaint was amended to include a count of negligence against Mr. Hussong and a count of intentional/reckless infliction of emotional distress against Mrs. Hussong, an assistant girls basketball coach.

harsh treatment, making her the target of profanity-laced tirades and disparaging comments about her weight. The mistreatment took a physical and emotional toll on Jennifer, causing an eating disorder and a condition called amenorrhea, a disruption of her menstrual cycle.

Philip Besler considered Hussong's conduct grossly unprofessional and felt that the School District's administrators were indifferent to Hussong's behavior and Jennifer's plight. When Mr. Besler's wife Carolann had approached Hussong to express her concerns, Hussong told her to "get out of my [f* * *ing] gym. The problem on this [f* * *ing] team is you [f* * *ing] parents and I want you to leave my [f* * *ing] girls alone." From April 1996 through January 1997, Mr. and Mrs. Besler met with the West Windsor–Plainsboro High School Principal, Michael Carr, and the District's Superintendent of Schools, Dr. Ray Bandlow; wrote letters to Carr, Dr. Bandlow, and the President of the Board of Education, Dr. Lester Bynum; and attended various Board meetings. Their purpose was to force the School District not only to take action against Hussong, but also to address the need for civility in coaching. Ultimately, the Beslers believed that the District was unresponsive to the issues they had raised. During the public comment period of nine Board meetings, the Beslers addressed their concerns about the failure of the District to hold coaches accountable for inappropriate and unsportsmanlike conduct.

At the April 23, 1996 meeting of the Board of Education, Mr. Besler asked the Board to "look[ ] into coaching behavior and distributed an article about problems with 'unsportsmanlike' behavior on the part of some coaches."

At the May 21 Board meeting, Mr. Besler commented on what he perceived was the District's double standard of requiring language-appropriate conduct by students using information technology but not imposing a similar code of conduct on coaches on the playing field. Dr. Bynum and the Assistant School Superintendent responded that the District "[did] not sanction inappropri-

ate language" by coaches and insisted that a code of conduct applied to coaches.

At the May 28 Board meeting, Mr. Besler indicated that, based on his reading of the code of conduct applicable to coaches, Hussong was in violation of the District's policies. He called for an investigation of Hussong's conduct.[2]

Mr. Besler attended the June 18 Board meeting because "it was rumored" that a vote would be taken on Hussong's contract at the next meeting. Because he would not be available on that date, he asked that the matter be postponed. Mr. Besler was advised that "personnel action would not be subject to public comment at a meeting."

At the June 25 Board meeting, Mr. Besler expressed "his concerns regarding the vulgar and abusive language used by his daughter's high school coach." He stated that he had taken his complaints to the administration but was told that it was "unable" to investigate the coach. He noted that after raising his concerns with the administration his daughter became the target of a police investigation stirred by "an anonymous letter and telephone call."[3] He again complained that the rules governing "unacceptable language" for teachers and students in the classroom and on the Internet did not seem to apply to coaches on the playing field. Last, he requested that the Board vote on each coach's reappointment individually. At that same meeting, five members of the public spoke in favor of the District's coaching staff, and Hussong was reappointed.

Five months later, on November 26, Mr. Besler attended his next Board meeting. During the public comment period, he read

---

[2] Three days later, Mr. and Mrs. Besler met with Dr. Bandlow, the School Superintendent. Mr. Besler recalled that Dr. Bandlow justified Hussong's approach to coaching, saying that "your daughter is going to be a better person for all of this." Evidently, the Beslers were not satisfied with that response.

[3] Mr. Besler had previously written Dr. Bandlow that he believed that the Plainsboro police had stopped Jennifer on two separate occasions in retaliation for her complaints about Hussong.

a statement expressing his belief that the members of the Athletic Review Committee formed to look into the rules of conduct governing coaches did not possess the requisite impartiality to perform their duties. Mr. Besler noted that the Athletic Review Committee consisted of, among others, Hussong's wife, who was an assistant coach on the girls basketball team; another of Hussong's assistant coaches who allegedly watched his "abusive behavior" with indifference; and various student-athletes who would be placed in the untenable position of making recommendations about the coaches for whom they played.

At the December 17 Board meeting, Mrs. Besler read the same statement her husband had delivered at the previous meeting.

On January 21, 1997, during the Board's public comment period, Mr. Besler attempted to ask the School District's Director of Planning a question. At this point, Carr, the Principal, "jump[ed] up" and stated that Mr. Besler should not be allowed to speak. The Board President, Dr. Bynum, directed Carr to sit down and allowed Mr. Besler to pose a question regarding a paragraph in the District Strategic Planning Committee Report that read: "We will not tolerate behavior that diminishes the dignity, self-worth, or safety of any individual." Dr. Bynum then told Mr. Besler that he had raised the issue before, that the Board and administration had responded to his concerns, and that Besler would not receive an answer "again at this time."

Mr. Besler also attended the January 28, 1997 Board meeting, which is the focus of this case. At least one hundred people were at this meeting. The public comment period began with a statement by Dr. Bynum: "This is the time in each regular monthly Board of Education meeting that we invite the thoughts and reactions on items of concern from members of our community who are present." Dr. Bynum stated that the public comment period would last no longer than thirty minutes and that no speaker would have more than five minutes of comment time.

The first member of the public to speak was a District resident who had spoken at length at numerous Board meetings. That

evening his comments lasted more than seven-and-one-half min-
utes and addressed various subjects, such as the effect of "afforda-
ble housing" on the School District, the need for equal treatment
of women in the high school sports program, and the potential
costs if Title IX (gender-discrimination) litigation were instituted
against the District.

Mr. Besler had his hand raised to speak next. Before calling on
him, Dr. Bynum made remarks that appeared specifically tailored
for Mr. Besler:

> Before I recognize the next person, let me just make some clarifications on this
> public comment section of our meeting. This section of the meeting is not intended
> for personnel discussions of individuals. It's not intended for allegations or
> insinuations about staff behavior or staff performance. It's for public comment
> only. It's not to allow people a stage or a forum to present their own personal
> views, particular views under litigation, on matters under litigation. So when those
> kinds of things occur, the chair reserves the right to cut off any discussion of that
> nature.

Besler then gave his name and address and, after speaking for
no more than thirty seconds, was silenced:

> Besler: A few months ago, this Board discussed policies for the use of technology
> in the system; specifically, you said that the use of harassing or abusive language
> or any obscenities on the Internet is strictly prohibited. Last week at the meeting
> of this Board, this district's strategic plan was introduced. Within the parameters,
> it was stated that we will not tolerate behavior which diminishes the dignity, self
> worth, or safety of any individual.
>
> [Four loud bangs of the gavel.]
>
> Bynum: You are out of order. We've heard those comments before several times
> from you, and the Board will not entertain those comments tonight again for the
> numerous times.
>
> Besler: May I hand my speech to you?
>
> Bynum: You can hand out, yes, whatever you have to say, but we are not going to
> entertain those comments. Any other comments from the public?

Had Besler been permitted to complete his prepared written
comments, he would have stated:

> My questions to this Board are: Do these guidelines apply to students as well as
> staff persons employed by this district? Secondly, Does the use of profanity
> including repeated use of the "F" word constitute abusive language? Lastly, Does
> the use of abusive language repeatedly, diminish the dignity of an individual.

Besler also intended to expand on his prepared remarks if he had
not been cut off.

After Besler sat down, two other members of the public spoke during the public comment period, one engaging in dialogue with the Board for more than twelve minutes and the other for more than eight minutes. Both spoke on various topics ranging from the budget to technology issues to courtesy busing.

Dr. Bynum later admitted that he could not recall ever preventing a parent or student from making positive remarks about a faculty member. The immediate past Board President noted that, during his tenure, the public comment period of board meetings was a time when members of the public could speak for three minutes "on any topic that they wish[ed]."

## C.

At the conclusion of the trial, on Jennifer's claims, the jury found Hussong liable for reckless infliction of emotional distress and negligence, and the Board of Education and certain officials liable for negligent supervision. The jury awarded Jennifer $3,000,000 but reduced the award by fifty-one percent due to Jennifer's failure to mitigate her damages.

The jury entered a verdict against the Board of Education on Mr. Besler's First Amendment claim, awarding Besler $100,000 in damages for pain and suffering.[4]

After the jury's verdict, the trial court granted defendants' motion for a directed verdict on Jennifer's claims and dismissed those claims.[5] The court denied the Board of Education's motions

---

[4] The trial judge instructed the jury that if it found Besler proved his First Amendment claim, then it could award him damages for any "emotional distress" that he may have suffered from the incident on January 28, 1997. The verdict sheet directed the jury to quantify any monetary damages resulting from Besler's "pain and suffering." While the term "pain and suffering" can clearly encompass more than emotional distress, in this case, based on the testimony, pain and suffering can only mean emotional distress.

[5] The trial court concluded that, despite Jennifer's eating disorder and amenorrhea, Jennifer did not prove that she suffered the permanent loss of a bodily

for judgment notwithstanding the verdict, a new trial, and a remittitur on Besler's First Amendment claim. Earlier, in denying the Board's motion for a directed verdict against Besler, the court found that a reasonable jury could conclude that "the Board simply did not want to hear what plaintiff had to say" and did not have "a significant or compelling governmental reason" to silence Besler at the Board meeting.

## II.

In an unpublished per curiam opinion, the Appellate Division affirmed the trial court's dismissal of Jennifer's claims. The panel also affirmed the trial court's ruling that there was sufficient evidence to present Mr. Besler's First Amendment claim to the jury. The panel determined that the School Board meeting was a public forum and therefore any content-based restrictions had to be both "narrowly drawn to achieve a compelling governmental interest," (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 *U.S.* 37, 45–46, 103 *S.Ct.* 948, 955, 74 *L.Ed.*2d 794, 805 (1983)), and "leave[ ] open ample alternative channels for communication of the information," (quoting *Ward v. Rock Against Racism,* 491 *U.S.* 781, 791, 109 *S.Ct.* 2746, 2753, 105 *L.Ed.*2d 661, 675 (1989)). The panel found the "critical issue" to be whether the Board's restriction on Besler's speech was content-based or content-neutral. In other words, the jury had to decide whether the Board restricted Besler's speech because of the content of what he had to say or because it was merely conducting an orderly and efficient meeting. In sustaining the verdict, the panel held that Dr. Bynum's motivation in gaveling down Besler was a question of fact to be decided by the jury.

The panel also held there was sufficient evidence to hold the Board directly liable for a First Amendment violation under

---

function, a fundamental requirement under the New Jersey Tort Claims Act, *N.J.S.A.* 59:9–2(d). The trial court also dismissed Jennifer's intentional-infliction-of-emotional-distress claim, finding that Jennifer's emotional distress was not "sufficiently severe" to support a verdict.

*Monell v. Department of Social Services,* 436 *U.S.* 658, 98 *S.Ct.*
2018, 56 *L.Ed.*2d 611 (1978), because "the evidence indicated the
Board had a policy permitting free speech for a limited period at
each Board meeting." The panel did not address the Board's
argument that the $100,000 pain-and-suffering damages award
was excessive.[6]

We granted the Board's cross-petition for certification. *Besler
v. Bd. of Educ. of West Windsor–Plainsboro Reg'l Sch. Dist.,* 198
*N.J.* 314, 966 *A.*2d 1079 (2009).

### III.

The Board has raised four issues for our consideration: (1)
whether the Appellate Division articulated the proper standard for
public-entity liability under *Monell;* (2) whether, under *Monell,*
liability could "be imputed to [the Board] for the isolated act of
one of its Board Members"; (3) whether Besler presented suffi-
cient evidence to support a violation of his right to free speech
under the First Amendment; and (4) whether the evidence sup-
ported the jury's award of $100,000 for Besler's pain-and-suffering
damages.

We first address whether the silencing of Besler by Dr. Bynum
at the January 28, 1997 Board meeting was an act attributable to
the Board under 42 *U.S.C.* § 1983 and the case law interpreting
that statute.

### IV.

### A.

■ In its charge to the jury on Besler's First Amendment
claim, the trial court never distinguished between Dr. Bynum and
the Board. The jury instructions made clear that if Dr. Bynum

---

[6] The panel mistakenly believed that the Board did not file a motion for a new
trial on damages.

violated Besler's right to free speech, the Board would be liable for his actions. The Board was given the opportunity to object to this portion of the jury instructions at the charge conference. It did not. Neither did the Board object when the charge was delivered to the jury. Indeed, the Board, in its own proposed charge, presented Dr. Bynum's and the Board's actions as one. Only after an unfavorable verdict did the Board assert, in a post-trial motion, that it could not be held liable, under 42 *U.S.C.* § 1983, as the direct cause of any constitutional violation because the Board did not implement "a *custom* or *policy*" that infringed on Besler's First Amendment rights.

■ At least at the time of trial, it appears that the parties accepted that Dr. Bynum's actions were sufficient to bind the Board for liability purposes under § 1983. That may be because the case law interpreting § 1983 makes clear that a final policy-maker, by his actions, may possess the authority to bind a public entity for a constitutional infringement, *Pembaur v. City of Cincinnati*, 475 *U.S.* 469, 480, 106 *S.Ct.* 1292, 1298, 89 *L.Ed.*2d 452, 463 (1986), and that the court, not a jury, decides the issue, *Jett v. Dallas Indep. Sch. Dist.*, 491 *U.S.* 701, 737, 109 *S.Ct.* 2702, 2723–24, 105 *L.Ed.*2d 598, 627–28 (1989). Although the record strongly suggests that the Board has waived any right to challenge the verdict based on a claim that Dr. Bynum was not a final policy-maker, *R.* 1:7–2, we will address the merits of its claim.

■ 42 *U.S.C.* § 1983 provides that a "person who, under color of any statute, ordinance, regulation, custom, or usage ... causes to be subjected, any [citizen or person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...." A school board is a "person" for purposes of § 1983. *Monell, supra*, 436 *U.S.* at 662, 690, 98 *S.Ct.* at 2021, 2035–36, 56 *L.Ed.*2d at 618, 635.

■ In *Monell*, the United States Supreme Court determined that, under 42 *U.S.C.* § 1983, a municipality or school board can

be held liable for acts committed by one of its employees or agents, pursuant to a government policy or custom, that violate the Constitution. *Id.* at 694, 98 *S.Ct.* at 2037–38, 56 *L.Ed.*2d at 638. *Monell* distinguished between acts directly attributable to a municipality and acts committed by one of its employees. *Id.* at 690–92, 98 *S.Ct.* at 2035–37, 56 *L.Ed.*2d at 635–36. In a § 1983 action, a school board is not vicariously liable for the conduct of one of its agents or employees solely through the doctrine of respondeat superior. *Id.* at 691, 98 *S.Ct.* at 2036, 56 *L.Ed.*2d at 636.

 Nonetheless, if the "government's authorized decision-makers" properly embark on a particular course of action, that action may be considered "an act of official government 'policy.' " *Pembaur, supra,* 475 *U.S.* at 481, 106 *S.Ct.* at 1299, 89 *L.Ed.*2d at 463–64. Under 42 *U.S.C.* § 1983, a municipality may be accountable for the action of an official who "possesses final authority to establish municipal policy with respect to the action ordered." *Stomel v. City of Camden,* 192 *N.J.* 137, 146, 927 *A.*2d 129 (2007) (quoting *Pembaur, supra,* 475 *U.S.* at 481, 106 *S.Ct.* at 1299, 89 *L.Ed.*2d at 464 (plurality opinion)); *see also Loigman v. Twp. Comm. of Middletown,* 185 *N.J.* 566, 591, 889 *A.*2d 426 (2006) (same). Stated differently, for § 1983 purposes, a municipality can be held liable for the acts of an official who is "responsible for establishing final government policy respecting [the questioned] activity." *Stomel, supra,* 192 *N.J.* at 146, 927 *A.*2d 129 (quoting *Pembaur, supra,* 475 *U.S.* at 483, 106 *S.Ct.* at 1300, 89 *L.Ed.*2d at 465 (plurality opinion)); *see also Loigman, supra,* 185 *N.J.* at 591, 889 *A.*2d 426 (same).[7]

---

[7] Although Part II–B of *Pembaur* commanded only a plurality, its language is widely relied on by courts throughout the country. *See, e.g., Valentino v. Vill. of S. Chi. Heights,* 575 *F.*3d 664, 675–76 (7th Cir.2009) (quoting Part II–B of *Pembaur* in discussing final policymaker status of public officials for § 1983 purposes); *Hill v. Borough of Kutztown,* 455 *F.*3d 225, 245–46 (3d Cir.2006) (citing *Pembaur* for same); *Riddick v. Sch. Bd. of Portsmouth,* 238 *F.*3d 518, 523 (4th Cir.2000) (quoting *Pembaur* for same).

Whether "an official ha[s] final policymaking authority is a question of state law." *Stomel, supra,* 192 *N.J.* at 146, 927 *A.*2d 129 (quoting *Pembaur, supra,* 475 *U.S.* at 483, 106 *S.Ct.* at 1300, 89 *L.Ed.*2d at 465 (plurality opinion)); *see also McMillian v. Monroe County,* 520 *U.S.* 781, 786, 117 *S.Ct.* 1734, 1737, 138 *L.Ed.*2d 1, 8 (1997). Moreover, determining whether a person is a final policymaker for a public body, such as a school board, is a question of law for the trial court and is not an issue to be submitted to the jury. *Jett, supra,* 491 *U.S.* at 737, 109 *S.Ct.* at 2723–24, 105 *L.Ed.*2d at 627–28; *see also Loigman, supra,* 185 *N.J.* at 591–92, 889 *A.*2d 426 (finding Township's special counsel "was not a municipal 'policymaker' for § 1983 purposes").

Typically, in determining which officials "speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional ... violation at issue," the trial court should review "state and local positive law, as well as custom or usage having the force of law." *Jett, supra,* 491 *U.S.* at 737, 109 *S.Ct.* at 2724, 105 *L.Ed.*2d at 628 (internal quotation marks omitted). Once the trial court has determined that an individual official has "the power to make official policy on a particular issue," it is then for the jury to decide whether that individual's decision "caused the deprivation of [the] right[ ] at issue." *Ibid.*

With those principles in mind, we now address the Board's petition.

### B.

First, we agree with the Board that the Appellate Division misapprehended the *Monell* standard. The issue is not whether "the evidence indicated the Board had a policy permitting free speech for a limited period at each Board meeting," as the Appellate Division perceived. Rather, the issue is whether the Board's practice, custom, or policy, or the action of its final policymaker, is the moving force that causes a violation of a

constitutional right. *See Monell, supra,* 436 *U.S.* at 694, 98 *S.Ct.* at 2037–38, 56 *L.Ed.*2d at 638.

Second, at least before the jury returned a verdict, both the parties and the court evidently considered Dr. Bynum, who presided over the Board's proceedings and the public comment period, to be the final policymaker. *See McMillian, supra,* 520 *U.S.* at 785, 117 *S.Ct.* at 1737, 138 *L.Ed.*2d at 8 (noting that official need only have final policy-making authority in "a particular area[ ] or on a particular issue" of municipal business to be final policymaker). No one questioned that the Board would be responsible for Dr. Bynum's actions. Indeed, Dr. Bynum stated during the public comment period on January 28, 1997, "the chair reserves the right to cut off any discussion." In addition, at the charge conference, the Board's counsel conceded that Dr. Bynum, as Board President, controlled the meeting.

Even if the remaining members of the Board had the authority to overrule Dr. Bynum and insist that Besler be heard, they obviously acquiesced in the decision to silence Besler. No Board member raised a voice that Besler should be permitted to speak. In that sense, the members of the Board, by their silence, ratified Dr. Bynum's gaveling down of Besler. *See Gros v. City of Grand Prairie,* 181 *F.*3d 613, 615 (5th Cir.1999) ("A policy or custom becomes official for purposes of § 1983 when it results from the decision *or acquiescence* of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." (emphasis added and citation omitted)). Clearly, Dr. Bynum and other Board members were the final policymakers for the Board of Education.

■ Last, even a single act or decision by a municipal policymaker violating the constitutional rights of and causing injury to a citizen can form the basis for municipal liability. *Pembaur, supra,* 475 *U.S.* at 480, 106 *S.Ct.* at 1298, 89 *L.Ed.*2d at 463 ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."); *Stomel, supra,* 192 *N.J.* at 146, 927 *A.*2d 129. If Besler was wrongly

silenced in violation of his First Amendment rights at the January 28 Board meeting and he suffered an injury, he has established the fundament of a cause of action. He does not have to establish that on multiple other occasions his free-speech rights were infringed by the Board before he can seek redress. *Pembaur, supra,* 475 *U.S.* at 480–81, 106 *S.Ct.* at 1298–99, 89 *L.Ed.*2d at 463–64.

We therefore conclude, as a matter of law, that Dr. Bynum was the final policymaker for the Board of Education during the public comment period of the Board meeting.

We next turn to the Board's challenge to the jury's verdict on Besler's First Amendment claim.

## V.

### A.

Besler argues that the Board of Education's President, Dr. Bynum, silenced him during the public comment period of the January 28, 1997 meeting because he was expressing a viewpoint disagreeable to the Board. In contrast, the Board submits that Dr. Bynum cut Besler off because Besler's comments were a rehash of remarks given at prior meetings. The basic issue presented to the jury was whether Dr. Bynum's motives in stopping Besler from delivering remarks critical of the Board and its employees were content-based or content-neutral.

The First Amendment to the United States Constitution prohibits the government from abridging "freedom of speech" or "the right of the people . . . to petition the Government for a redress of grievances." *U.S. Const.* amend. I.[8] The First Amend-

---

[8] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *New York Times, Co. v. Sullivan,* 376 *U.S.* 254, 277, 84

ment gives people the right to express disagreement with government policy, whether on the national, state, or local level. *See NAACP v. Claiborne Hardware Co.*, 458 *U.S.* 886, 913, 102 *S.Ct.* 3409, 3425, 73 *L.Ed.*2d 1215, 1236 (1982) ("[E]xpression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." (citation and internal quotation marks omitted)). Our free society must give breathing room for an "uninhibited" and "robust" discussion of public issues, even when it "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 270, 84 *S.Ct.* 710, 721, 11 *L.Ed.*2d 686, 701 (1964). One of the core purposes of the First Amendment is to protect speech on matters of public interest, including speech that the government finds offensive. *See Police Dep't of Chi. v. Mosley*, 408 *U.S.* 92, 96, 92 *S.Ct.* 2286, 2290, 33 *L.Ed.*2d 212, 217 (1972). Freedom of speech, therefore, protects not just the speech that we find agreeable, but also the speech that we hate. *See Tex. v. Johnson*, 491 *U.S.* 397, 414, 109 *S.Ct.* 2533, 2545, 105 *L.Ed.*2d 342, 360 (1989); *see also Girouard v. U.S.*, 328 *U.S.* 61, 68, 66 *S.Ct.* 826, 829, 90 *L.Ed.* 1084, 1090 (1946) (citing *U.S. v. Schwimmer*, 279 *U.S.* 644, 654–55, 49 *S.Ct.* 448, 451, 73 *L.Ed.* 889, 893 (1929) (Holmes, J., dissenting)).[9]

---

S.Ct. 710, 724, 11 *L.Ed.*2d 686, 704 (1964); *see also Near v. Minnesota*, 283 *U.S.* 697, 707, 51 *S.Ct.* 625, 628, 75 *L.Ed.* 1357, 1363 (1931) ("It is no longer open to doubt that the liberty of the press and of speech is within the liberty safeguarded by the due process clause of the 14th Amendment from invasion by state action.").

[9] Unlike our dissenting colleague, we believe that the constitutional protection of free speech allows our citizens to speak their minds even if they "needlessly offend" a public official or government officer. *Infra* at 599, 993 *A.*2d at 838. Free speech in a democracy is not a tidy thing. To the extent the dissent suggests that government censorship of remarks that "needlessly offend" is supported by language in *Whitney v. California*, 274 *U.S.* 357, 371, 47 *S.Ct.* 641, 646–47, 71 *L.Ed.* 1095, 1104 (1927), *infra* at 599–600, 993 *A.*2d at 838–39, we note that *Whitney* was explicitly overruled by *Brandenburg v. Ohio*, 395 *U.S.* 444, 449, 89 *S.Ct.* 1827, 1830–31, 23 *L.Ed.*2d 430, 435 (1969).

Heightened protection is given to speech in public forums, such as parks, streets, and sidewalks, "which by long tradition or by government fiat have been devoted to assembly and debate." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 *U.S.* 788, 802, 105 *S.Ct.* 3439, 3449, 87 *L.Ed.*2d 567, 580 (1985) (citation and internal quotation marks omitted); *see also State v. DeAngelo*, 197 *N.J.* 478, 485–86, 963 *A.*2d 1200 (2009). A public forum is also "property which the State has opened for use by the public as a place for expressive activity." *Perry, supra,* 460 *U.S.* at 45, 103 *S.Ct.* at 955, 74 *L.Ed.*2d at 805. The public comment period of a school board meeting is a public forum. *Madison Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n,* 429 *U.S.* 167, 174–76, 97 *S.Ct.* 421, 426, 50 *L.Ed.*2d 376, 384–85 (1976).

However, the right to free speech is not absolute and is subject to reasonable limitations. A governmental entity may impose reasonable time, place, and manner restrictions on speech in a public forum so long as "the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " *Ward, supra,* 491 *U.S.* at 791, 109 *S.Ct.* at 2753, 105 *L.Ed.*2d at 675 (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L.Ed.*2d 221, 227 (1984)). Significantly, once a governmental entity, such as a school board, opens the floor for discussion of relevant matters of public interest and concern, it "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Mosley, supra,* 408 *U.S.* at 96, 92 *S.Ct.* at 2290, 33 *L.Ed.*2d at 217.

Although the government may not use a regulation as a pretext to suppress "speech because of disagreement with the message it conveys," it may impose "[a] regulation that serves purposes unrelated to the content of [the] expression . . . even if it

has an incidental effect on some speakers or messages but not others." *Ward, supra,* 491 *U.S.* at 791, 109 *S.Ct.* at 2754, 105 *L.Ed.*2d at 675. "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ibid.* (citations and internal quotation marks omitted).

 A public body may control its proceedings in a content-neutral manner by stopping a speaker who is disruptive or who fails to keep to the subject matter on the agenda, *Jones v. Heyman,* 888 *F.*2d 1328, 1332–33 (11th Cir.1989), or whose "speech becomes irrelevant or repetitious," *White v. City of Norwalk,* 900 *F.*2d 1421, 1425 (9th Cir.1990). For example, in *Eichenlaub v. Township of Indiana,* the plaintiff who attended a Township Board of Supervisors meeting was removed during the public comment period because he was "repetitive and truculent," and "repeatedly interrupted the chairman of the meeting." 385 *F.*3d 274, 281 (3d Cir.2004). The Third Circuit Court of Appeals affirmed the dismissal of the plaintiff's First Amendment claims, finding that the chairman's aims and motives in ejecting the plaintiff were content-neutral: "to prevent [ ] badgering, constant interruptions, and disregard for the rules of decorum." *Ibid.* The Third Circuit emphasized that the First Amendment does not require the presiding officer of a public meeting to sit idly by while a speaker attempts to "hijack" or "filibuster" the proceedings. *Ibid.*

 The government or a school board, however, has the burden of showing that its restriction of speech in a public forum was done for a constitutionally permissible purpose. *See U.S. v. Playboy Entm't Group, Inc.,* 529 *U.S.* 803, 816, 120 *S.Ct.* 1878, 1888, 146 *L.Ed.*2d 865, 881 (2000); *Phila. Newspapers, Inc. v. Hepps,* 475 *U.S.* 767, 777, 106 *S.Ct.* 1558, 1564, 89 *L.Ed.*2d 783, 793 (1986) ("In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified.").

We now apply the principles of our First Amendment jurisprudence to the facts found by the jury.[10]

## B.

 In reviewing whether the trial court properly denied the Board's motion for a judgment notwithstanding the verdict, *R.* 4:40–2, we "must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced [from the evidence]." *Lewis v. Am. Cyanamid Co.*, 155 *N.J.* 544, 567, 715 *A.*2d 967 (1998). This approach respects the jury's singular role in resolving "disputed factual matters." *Ibid.* A jury's verdict should not be disturbed merely because "reasonable minds" might have reached different conclusions based on the evidence. *Ibid.*; *see also Dolson v. Anastasia,* 55 *N.J.* 2, 5, 258 *A.*2d 706 (1969).[11]

The jury heard both sides of the story, and was properly charged on the law. The trial court instructed the jury that the Board was entitled to run an "orderly and efficient" meeting and that allowing Besler "to distribute copies of his statement . . . was an alternative means to express his views." The jury was told that it should find in favor of the Board if Dr. Bynum interrupted

---

10 In the free-speech count in Besler's complaint, he also sought relief under the New Jersey Constitution, which guarantees the right to free speech. *N.J. Const.* art. I, ¶ 6 ("Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press."). Besler never developed this argument. The parties do not contend that in this case a different result would obtain under the New Jersey Constitution than under the United States Constitution. We see no reason to address an argument that has not been advanced by a party.

11 Our dissenting colleague disregards this standard by painting Mr. Besler in the most pejorative light while exalting the actions and motives of the Board. It is not the role of a court to substitute its judgment for the jury when reasonable minds could differ as to the outcome. The jury was free to reject the credibility and factual findings that the dissenter makes in his opinion.

Besler's remarks because they were "irrelevant to the agenda, involved a matter in litigation or [were] repetitious." On the other hand, the jury was charged that it should find for Besler if Dr. Bynum suppressed his speech "because the Board did not simply want to hear what [Besler] had to say, or because the Board disagreed with [Besler's] viewpoint." The trial court placed in the hands of the jury the task of making ultimate findings of fact and reaching legal conclusions based on those factual determinations.

The evidence viewed in the light most favorable to Besler is that Dr. Bynum gaveled him down at the January 28 meeting because he was attempting to expose the hypocrisy between words and reality, between the Board's strategic plan, which did "not tolerate behavior which diminishes the dignity, self-worth, or safety of any individual," and the Board's condoning foul-mouthed, abusive coaches who belittled and demeaned student-athletes. Unquestionably, the Board's failure to curb abusive coaching practices was a theme of Besler's previous remarks. But the jury was permitted to find that Besler, even if plowing similar ground, was touching on a new subject, the strategic plan, and that the Board was merely attempting to paper over an unpleasant topic that it did not want aired in a hall filled with one hundred people. Besler was gaveled down thirty seconds into his presentation, whereas three other members of the public each commanded the floor for periods in excess of five minutes. The evidence does not suggest that Besler's conduct was obstreperous or truculent, or that he was attempting to hijack or filibuster the proceedings.[12] Indeed, Besler respectfully sat down when instructed to do so.

The jury was free to find that Dr. Bynum's warning comments, evidently directed at Besler, who was the next speaker, revealed impatience and antagonism toward a viewpoint he did not want to hear. Dr. Bynum cautioned:

---

[12] In summation, the Board told the jury that it was not "contending that Mr. Besler was disruptive, but ... that his speech was repetitive and it was irrelevant to the matters that were being considered by the Board at certain times."

This section of the meeting is not intended for personnel discussions of individuals. It's not intended for allegations or insinuations about staff behavior or staff performance. It's for public comment only. It's not to allow people a stage or a forum to present their own personal views, particular views under litigation, on matters under litigation. So when those kinds of things occur, the chair reserves the right to cut off any discussion of that nature.

Dr. Bynum, however, had never interrupted any person who offered a favorable opinion about school personnel or showered compliments on the coaches.[13] Moreover, the Board did not argue in its trial summation or on appeal that Mr. Besler was barred from speaking because his remarks touched on a subject concerning litigation.[14] The Board President silenced Besler for one ostensible reason: "We've heard those comments before several times from you, and the board will not entertain those comments tonight again for the numerous times." Besler, however, contends that the Board's claim of repetitiveness was merely a cover to suppress an unpopular opinion.

---

[13] Despite the Board's failure to raise the argument on appeal, the dissent contends that the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, gave the Board authority to restrict speech, during the public comment period, on matters pertaining to litigation or personnel. However, the Act merely states that the Board may go into private session when discussing such matters. *N.J.S.A.* 10:4–12(b) provides that "[a] public body may exclude the public only from that portion of a meeting at which the public body discusses" certain matters, such as those pertaining to "pending or anticipated litigation" and the employment, evaluation, and discipline of personnel. Nowhere does the Act state that a citizen's voice cannot be heard on personnel or other matters during the time set aside for public comment. Indeed, the public comment period is a time for Board officials to hear grievances from parents and other interested parties, whether those grievances are particular to the treatment of a student or address systemic shortcomings in a school district's policies. Of course, nothing in the Act requires a board member to respond to remarks made during the public comment session that touch on litigation or personnel matters.

[14] In accordance with the New Jersey Tort Claims Act, *N.J.S.A.* 59:8–3, before filing their civil complaint in January 1998, the Beslers filed two Notices of Claim with the Board, one on May 22, 1996 and the other on July 24, 1996. Besler addressed the Board on several occasions before and after the filing of these Notices. The Board never attempted to silence Besler on the basis that he had filed these Notices. After all, Besler's filing of a Notice of Claim did not compel him to surrender his free-speech rights.

Clearly, Besler was not a cheerleader of the Board; he was a critic of its policies and actions. Dr. Bynum and other board members may have considered Besler's remarks grating and tiresome, but the public comment period was a time for citizens, including Besler, "to make known their opinions to their representatives, and to petition for redress of grievances." *N.J. Const.* art. I, ¶ 18. For public officials, particularly those who may be subject to "vehement, caustic, and sometimes unpleasantly sharp attacks," *New York Times, supra,* 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701, free speech is not for the fainthearted. Such officials must be thick-skinned enough to tolerate the uninhibited and robust debate on public issues that the First Amendment demands.

The jury was required to engage in a highly fact-sensitive analysis. Ultimately, in rendering its verdict, the jury found that the Board did not prove that Dr. Bynum interrupted Besler's "speech for a significant or compelling governmental reason." The jury obviously determined that Dr. Bynum's motivation was not content-neutral, rejecting his claim that he silenced Besler because of the sheer repetitiveness of his remarks. Furthermore, the jury rejected the Board's argument that it muzzled Besler for the purpose of conducting an "orderly and efficient" meeting.

Reasonable persons may disagree about whether the Board should have been held liable. However, this Court is not a juror of last resort. We are satisfied that this jury rendered a verdict that is sustainable on the evidence. Accordingly, the trial court did not err in denying the Board's motion for judgment notwithstanding the verdict.

Nevertheless, we are constrained to remand to the trial court for a remittitur of the damages award or, alternatively, for a new trial. We find that the damages award is clearly excessive and was likely caused by the evidential spillover from Jennifer's case, which prejudiced the Board's ability to receive a fair consideration on damages.

576

## VI.

### A.

Under 42 *U.S.C.* § 1983, a constitutional violation, standing alone, does not entitle a plaintiff to compensatory damages. *Memphis Cmty. Sch. Dist. v. Stachura,* 477 *U.S.* 299, 305–08, 106 *S.Ct.* 2537, 2542–43, 91 *L.Ed.*2d 249, 257–60 (1986). A plaintiff in a § 1983 case can only recover compensatory damages for a constitutional violation if he proves that he suffered an "actual injury." [15] *Id.* at 308, 106 *S.Ct.* at 2543, 91 *L.Ed.*2d at 259.

Emotional distress can constitute an actual injury under § 1983. *Carey v. Piphus,* 435 *U.S.* 247, 263–64, 98 *S.Ct.* 1042, 1052, 55 *L.Ed.*2d 252, 265 (1978). However, a plaintiff must show a causal connection between the constitutional violation and the emotional distress—the injury. *See id.* at 254–55, 263–64, 98 *S.Ct.* at 1047–48, 1052, 55 *L.Ed.*2d at 259, 265. Emotional-distress damages are not presumed; they must be proved. *See id.* at 263–64, 266, 98 *S.Ct.* at 1052, 1054, 55 *L.Ed.*2d at 265, 266.

### B.

Trial and appellate courts are loath to second-guess a damages award rendered by a jury. We recognize that quantifying pain-and-suffering damages into dollars is "not susceptible to scientific precision" and that a jury must be accorded "a high degree of discretion" in doing justice in such matters. *Johnson v. Scaccetti,* 192 *N.J.* 256, 279–80, 927 *A.*2d 1269 (2007). Despite the great deference given to a jury award of damages, our courts

---

[15] In § 1983 cases, damages are determined according "to principles derived from the common law of torts." *Stachura, supra,* 477 *U.S.* at 306, 106 *S.Ct.* at 2542, 91 *L.Ed.*2d at 258. Damages are "customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Carey v. Piphus,* 435 *U.S.* 247, 263–64, 98 *S.Ct.* 1042, 1052, 55 *L.Ed.*2d 252, 265 (1978). However, a plaintiff can be awarded nominal damages for a constitutional violation in the absence of an actual injury. *Id.* at 266–67, 98 *S.Ct.* at 1053–54, 55 *L.Ed.*2d at 266–67.

retain the authority to overturn an award that "clearly and convincingly" appears so excessive that it constitutes "a miscarriage of justice." *Id.* at 280, 927 *A.*2d 1269 (quoting *R.* 4:49–1(a)); *see also Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597–98, 379 *A.*2d 225 (1977). Stated differently, "[a] trial court should not order a new trial or remit a jury's damages award unless it is so clearly disproportionate to the injury ... that it may be said to shock the judicial conscience." *Johnson, supra*, 192 *N.J.* at 281, 927 *A.*2d 1269.

 "[W]hen a defendant moves for a new trial, successfully claiming that a jury awarded excessive damages," a court has the power of remittitur—that is, to reduce the damages and to give the plaintiff the opportunity to accept the reduced amount or opt for a new trial on damages. *Johnson, supra*, 192 *N.J.* at 280–81, 927 *A.*2d 1269; *see also Fertile v. St. Michael's Med. Ctr.*, 169 *N.J.* 481, 491, 779 *A.*2d 1078 (2001). If the plaintiff does not consent to the reduced amount, he is entitled to a new damages trial. *Johnson, supra*, 192 *N.J.* at 281, 927 *A.*2d 1269. "The use of remittitur is encouraged whenever possible to avoid the 'unnecessary expense and delay of a new trial.'" *Id.* at 280, 927 *A.*2d 1269 (quoting *Fertile, supra*, 169 *N.J.* at 492, 779 *A.*2d 1078).

 The role of an appellate court "in assessing a jury verdict for excessiveness is to assure that compensatory damages awarded to a plaintiff encompass no more than the amount that will make the plaintiff whole." *Jastram ex rel. Jastram v. Kruse*, 197 *N.J.* 216, 228, 962 *A.*2d 503 (2008) (citations and internal quotation marks omitted). We apply the same standard of review as the trial court in assessing whether a damages award is excessive, with the significant exception that we must give due "deference to the trial court's 'feel of the case.'" *Johnson, supra*, 192 *N.J.* at 282, 927 *A.*2d 1269 (citation omitted). In considering whether the request for a remittitur is meritorious, we must view "the evidence in the light most favorable to the plaintiff." *Id.* at 281, 927 *A.*2d 1269. A trial or appellate court that grants a remittitur must give a statement of "reasons for reducing a

damages award." *Ibid.* When articulating reasons for an award reduction, a court must cite to the trial record and may compare the damages award to other such awards. *Ibid.*

In light of our remittitur jurisprudence, we now turn to the facts before us.

## C.

In assessing whether the $100,000 damages award is commensurate with Besler's claimed injuries, we begin by observing that Besler's First Amendment claim and Jennifer's multiple tort claims were presented to the same jury. The vast majority of the more than fifty-five witnesses at the three-month-long trial spoke almost exclusively about Jennifer's case. Those witnesses gave emotionally jarring testimony about Coach Hussong's intemperate behavior, such as his frequent use of profane language and, in one instance, his slamming a locker room door on the hand of an athlete. The jury also heard testimony about Jennifer's eating disorder and temporary loss of her menstrual cycle. This evidence bore little relevance to whether the Board violated Besler's free-speech rights or his claim for damages.

The jury awarded Besler $100,000 in pain-and-suffering damages based on testimony that, after he was gaveled down at the January 28 Board meeting, he was "completely embarrassed," "shocked," "bewildered," "sick to [his] stomach," and felt like a leper. That was largely the testimony describing the injury Besler suffered as a result of the violation of his First Amendment rights. Although Besler was not required to present psychological or psychiatric expert testimony about his mental anguish, he offered no testimony on the depth or degree of his emotional distress or suffering. *See Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 36 (3d Cir.1994) (holding "expert medical evidence is not required to prove emotional distress in section 1983 cases"). For example, he did not claim that the incident caused nightmares or sleeplessness, or impaired his reputation, his relations with others, or his ability to function. The jury was left with testimony that supported, at best, transient emotional distress.

On the one hand, federal circuit courts of appeals have overturned compensatory damages awards based on minimal emotional-distress testimony. *See Price v. City of Charlotte,* 93 *F.*3d 1241, 1243, 1255–57 (4th Cir.1996) (reducing § 1983 emotional-distress damages award of $3,000 to nominal damages of $1 based on generic testimony that plaintiffs felt "betrayed," "embarrassed," "degraded," and "devastated" over failure of municipality to promote on account of race), *cert. denied,* 520 *U.S.* 1116, 117 *S.Ct.* 1246, 137 *L.Ed.*2d 328 (1997); *Spence v. Bd. of Educ. of the Christina Sch. Dist.,* 806 *F.*2d 1198, 1201 (3d Cir.1986) (affirming district court's elimination of emotional-distress damages award of $22,060 in First Amendment case because plaintiff made merely general assertions "that she was depressed and humiliated by the [job] transfer and that she had lost her motive to be creative"); *Nekolny v. Painter,* 653 *F.*2d 1164, 1166, 1172–73 (7th Cir.1981) (reversing emotional-distress damages awards on First Amendment claim for three plaintiffs ranging from $5,000 to $2,500 because "[a] single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated' . . . is not enough to establish injury even when the statement is considered along with the facts of [the] case"), *cert. denied,* 455 *U.S.* 1021, 102 *S.Ct.* 1719, 72 *L.Ed.*2d 139 (1982).

On the other hand, when plaintiffs have sufficiently articulated emotional distress or pain and suffering, damages awards have been sustained. *Miner v. City of Glens Falls,* 999 *F.*2d 655, 662–63 (2d Cir.1993) (upholding $12,000 emotional-distress damages award in § 1983 case where plaintiff's testimony demonstrated trauma of losing his home, income, and professional standing in community); *DeNieva v. Reyes,* 966 *F.*2d 480, 482, 487 (9th Cir.1992) (affirming $50,000 damages award in § 1983 case for violating plaintiff's constitutional right to travel due to government's wrongful confiscation of plaintiff's passport for eleven days where testimony "indicat[ed] that [plaintiff] had suffered emotional distress and physical trauma," including insomnia, dizziness, and vomiting, during eleven-day period); *Rodriguez v. Comas,* 888

*F.*2d 899, 900, 906 (1st Cir.1989) (affirming $75,000 damages award in § 1983 case where plaintiff was illegally arrested and evidence included psychiatrist's testimony that plaintiff suffered from "a post traumatic stress disorder" involving "chest pains, headaches, insomnia, and recurrent invasive recalls or memories of the events").

We discern from these cases that compensatory damages for emotional distress, in the amount awarded here, must be based on more than de minimis mental anguish, or fleeting embarrassment, or mere shock and bewilderment. Clearly, Besler was deeply upset and humiliated because he was not accorded the right to complete his statement to the Board. We also recognize that some jurisdictions may pay less deference than we do to a jury's damages award. Nevertheless, viewing the record in the light most favorable to Besler, we conclude that the $100,000 damages award is so clearly excessive that it constitutes "a miscarriage of justice." We are convinced that the evidential spillover from Jennifer's case infected the jury's consideration of damages. Whereas the jury's finding of a constitutional violation is grounded in evidence in the record, even the most generous consideration of the testimony from Besler's perspective does not support the damages awarded.

We therefore remand to the trial court for a remittitur of the damages award, leaving to its sound discretion the appropriate reduction. In the event that Besler does not accept the remittitur, he will be entitled to a new trial on damages.

## VII.

For the reasons expressed, we affirm that part of the Appellate Division's judgment that upheld the jury's finding that the Board violated Besler's First Amendment rights. We reverse the trial court's denial of a remittitur.[16] We remand to the trial court for a remittitur hearing consistent with the opinion of this Court.

---

[16] As noted earlier, the Appellate Division did not address the trial court's denial of the Board's motions for a new trial on damages and remittitur.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

According to the majority, the following summarizes the salient facts at issue in this appeal:

During the public comment period of a meeting of the Board of Education of the West Windsor–Plainsboro Regional School District (Board), the Board President denied plaintiff Philip Besler the opportunity to complete a statement critical of both Board policy and a high school coach he believed had verbally abused student-athletes, including his daughter. Besler filed a federal civil rights claim pursuant to 42 *U.S.C.* § 1983, alleging that he was entitled to express his grievances at the meeting—a public forum—and that the Board violated his free-speech rights guaranteed by the First Amendment. A jury found that the Board did not have a "compelling" reason to justify silencing Besler and awarded him monetary damages in the amount of $100,000. The Appellate Division affirmed.

[*Ante* at 554, 993 *A.*2d at 810–11.]

Thus, before us are not Besler's original claims—whether his daughter had been "verbally abused" by her high school basketball coach—as those claims were rejected by the courts below and are not encompassed in this appeal. Instead, this appeal is narrowly focused on Besler's claim that, at his ninth consecutive appearance during the public comment period of a Board meeting at which he raised that same subject, he was interrupted once, and that such interruption alone gives rise to liability for infringement of his constitutional rights. In far simpler terms, this is nothing more than a case where the tail seeks to wag the dog.

Based on its factual predicate, the majority reaches three legal conclusions. First, the majority concludes that "for purposes of 42 *U.S.C.* § 1983, the Board President was acting as a final policymaker while presiding over the public comment period of the Board meeting[,]" *ante* at 555, 993 *A.*2d at 811, from whose acts, in the proper circumstances, liability could flow to the Board. That conclusion is legally unassailable and, to that limited extent, I readily concur with the majority.

However, the majority also holds that "Besler presented sufficient evidence for the jury to determine that the Board silenced him for no reason other than the unpopular viewpoint he expressed[,]" explaining that "[w]e thus must respect the jury's

finding that the Board violated Besler's free-speech rights." *Ante* at 555, 993 *A*.2d at 811. It further states that "Besler offered only minimal evidence of emotional distress—transient embarrassment and humiliation as a consequence of the abrupt manner in which he was prevented from completing his remarks[,]" thus concluding that "the damages award is so clearly excessive that it constitutes a miscarriage of justice and therefore remand[ing] to the trial court for a remittitur or, alternatively, a new trial on damages." *Ante* at 555, 993 *A*.2d at 811.

The majority's main conclusion—that "Besler presented sufficient evidence for the jury to determine that the Board silenced him for no reason other than the unpopular viewpoint he expressed[,]" *ante* at 555, 993 *A*.2d at 811 —is based on an incomplete, and thus impermissibly skewed, recitation of the evidence of record in this appeal. Fairly and impartially viewing *all* of the record evidence through the required procedural prism applicable here, the conclusion that, as a matter of law, there is sufficient credible evidence in this record to sustain the verdict in Besler's favor is simply unsupportable. Therefore, based on the absence of competent proofs of liability, Besler's claim should fail.

Moreover, even if one were to accept the premise that the paltry liability proofs adduced by Besler somehow were barely sufficient to squeak by the threshold needed to sustain a jury verdict, the skimpy proofs of damages Besler presented—that, as a result of being "gaveled down," he was "embarrassed" and his "stomach start[ed] gurgling[,]" all without any independent manifestation of injury—are so pathetically trivial, so legally insignificant, so factually inconsequential as to constitute no proof of cognizable damages at all. Thus, the judgment in Besler's favor should be reversed.

Because the majority sustains Besler's ill-gotten judgment and remands only as to the quantum of damages to be awarded, I respectfully dissent.

## I.

The majority's factual recitation is not complete. As this appeal arises from the denial of a motion for judgment notwithstanding the verdict, a more robust summary of the facts is required.

## A.

During the 1995–1996 academic year, Jennifer Besler was a senior at West Windsor–Plainsboro High School, where she was a member of the girls' varsity basketball team. At some point in the basketball season, Jennifer claimed to her parents that her basketball coach had told her to lose weight and had used profanity in addressing his players. Besler and his wife, Carolann, took offense in respect of the treatment of their daughter, at least as they perceived it. However, because Jennifer asked them to "stay out of it," they remained silent, while their resentment obviously simmered at a boiling point.

After the 1995–1996 basketball season ended in a loss to Piscataway High School in the Central Jersey Girls' Basketball Championship game,[1] Besler embarked on a one-man vendetta against his

---

[1] The game was played two weeks before the coach received his annual evaluation. That otherwise stellar evaluation was marred and heavily influenced by post-game derogatory comments the coach made in respect of the officiating of the game. The comments published in a local newspaper were: "Here we are in a sectional final and they assign two bums that can't handle the game[.] What those two guys did to a group of 15 hard-working girls and a coaching staff of four people was a disgrace and I'm sick."

The March 1996 evaluation nevertheless rated the coach with the highest score in eight out of eight categories in organization and management; two of two categories in self-improvement; eight of eight categories in student-staff relations; and four of six categories in personal skills. The evaluation's written comments describe him as "a complete coach who cares about every aspect of his program[;]" as one who "attends league and state meetings [and] runs a camp in the summer and a 4-team league[;]" as one who "will attend a program to focus his intensity[;]" as one who "communicate[s] his goals and objectives to the players and their parents [and] conducts a pre-season meeting at which he tries to avert problems during the season[;]" as one who produces "a definite improvement in players from the start of the season and the end[;]" as one who

daughter's now-former coach. As noted in the Board's minutes, on April 23, 1996, Besler attended a meeting of the Board and, during the public comment period, "spoke to the [B]oard concerning the possibility of looking into coaching behavior and distributed an article about problems with 'unsportsmanlike' behavior on the part of some coaches." Three days later, on April 26, 1996, Besler followed up with a letter to the president of the Board, complaining about "the coaching situation at the high school[,]" enclosing certain written material, and threatening that "if this matter is not remedied quickly, then I will have no alternative but to seek redress through other available means."

Undaunted, on May 21, 1996, Besler once again attended a Board meeting, where he again spoke during the period reserved for public comment. As reflected in the Board's minutes, he "commented on what he perceives as a two[-]tiered system—why do we have a code of conduct for technology on one hand for students, and allow use of inappropriate language by adults on the playing field?" The minutes also reflect that both the president of the Board and an assistant superintendent of schools "stated that we do not sanction inappropriate language, that there is, indeed, a

---

"displays many positive personal skills and can be a complete coach[;]" and as one who "instructs effectively leading to improvement in basic skills and his teams are a source of pride for the school."

The coach's ill-advised post-game comments concerning the championship game officiating ultimately resulted in formal charges before the Controversies Committee of the New Jersey State Interscholastic Athletic Association (NJSIAA). For that reason, his evaluation noted that "[h]e must improve relations with officials and control his intensity on the bench [and that] he will abide by the memo of understanding which is included as part of this evaluation."

In the end, however, the catalyst for the sole negative aspects of the evaluation addendum—the coach's post-championship game comments concerning the officials—resulted in "the most minimal penalty available for a violation of the sportsmanship rule": the Controversies Committee of the NJSIAA ordered only that the coach "be placed on a period of probation for the 1996–97 school year, during which appropriate game reports will be filed by [the high school] administration with the NJSIAA. There will be no fines or other penalties."

code of conduct for coaches, which is handled through administrative procedure."

Dissatisfied with that response, the very next day, May 22, 1996, Besler, through his lawyer and as a predicate to filing his lawsuit,[2] issued a written notice to the Board alleging that (1) the coach had verbally and mentally abused his daughter and thus had "caused and continues to cause emotional and mental suffering[;]" (2) the high school principal had "failed and/or refused to supervise, investigate or prevent the conduct of the [coach] in spite of notice to him of these incidents, causing further damage[;]" and (3) the Board had "failed and/or refused to implement procedures which would prevent such abusive behavior or conduct, causing further damage[.]" For these claims, Besler sought "reimbursement in the amount of $1,250,000."

Less than one week later, on May 28, 1996, Besler again attended a Board meeting, where, also during the public comment period, he claimed he had reviewed the code of conduct governing coaches and that, in his opinion, the girls' basketball head coach "broke most of them." According to Besler, he attended that meeting "to identify the rules that [the coach] broke that were against those regulations that [the Board] had in place" and "to come up with a policy on coaches, a policy that was enforceable." He "asked for an investigation" of the girls' basketball head coach. Following that appearance at the May 28, 1996 Board meeting, Besler met with the superintendent of schools on May 31, 1996,

---

2 Because Besler's original claims were lodged against the Board—a public entity—and the high school principal and the girls' basketball head coach—both public employees—the prosecution of those claims was governed by the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3. Pursuant to notice provisions of that Act, *N.J.S.A.* 59:8–3, "[n]o action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." It also requires that the notice must be in writing, *N.J.S.A.* 59:8–6; signed, *N.J.S.A.* 59:8–5; and contain, among other things, sufficient particulars concerning the claim, including "[t]he amount claimed as of the date of presentation of the claim," *N.J.S.A.* 59:8–4.

where he again repeated his charges against the girls' basketball head coach.

Seemingly oblivious that he, through his counsel, had placed the Board on written notice of a million dollar-plus claim, utterly unaware of the actions taken in respect of the coach's March 1996 evaluation, and although his daughter's dealings with the basketball coach had ended and she was to graduate in short order,[3] Besler followed up on the May 31, 1996 Board meeting by writing directly to the superintendent of schools. By a letter dated June 4, 1996, Besler sought to "solidify and put into writing [his] complaint concerning the girls['] basketball coach" at the high school. Listing eight incidents Besler alleged had "occurred while [his daughter] was on the varsity team[,]" he demanded to "know within ten days ... what action you will be pursuing." Staring down a $1,250,000 claim, it is entirely unremarkable that the superintendent of schools neither acceded to nor responded to Besler's "demand."

By a letter dated June 11, 1996, Besler again wrote to the president of the Board, this time enclosing "a comparison of students and coaches being controlled[,]" noting that, "in [his] opinion, the comparison highlights the inconsistency the School Board is exhibiting in strictly monitoring the students but allowing the coaches to break those same rules."

A week later, on June 18, 1996, Besler attended the next meeting of the Board. The minutes reflect two diametrically opposed points raised concerning the Board's treatment of coaches. Early in the meeting,

a high school teacher[ ] read a statement from the district's coaches expressing concern that the [B]oard had stepped beyond their mandated role of policy maker into the role of supervisor. The statement cited the contents of a recent letter to

---

[3] The record reflects that Besler has additional, younger children. However, it also reflects that he has elected to place them in private schools. Hence, in a very practical sense, none of his other children would have had any dealings with the coach of whom Besler objected.

district coaches informing them that the [B]oard would be reviewing their evaluations [that] evening.

The coaches ask the [B]oard to follow the model they are responsible for maintaining, not only through policy, but through the district's current mission to strengthen site-based decision making.

With this proposed review of evaluations, it is felt that the [B]oard is creating a precedent that has implications not only on the playing field, but in the classroom as well. The coaches asked the Board to recognize the implications of their actions and reconsider.

In contrast, Besler later "told the [B]oard that it was 'rumored' that a vote would be taken on a personnel matter [the coach's contract] at the [B]oard meeting on June 25th." Asserting "he would be out of the country on that date," Besler "requested that the [B]oard defer the vote to another time[.]" A member of the Board "told Mr. Besler that a personnel action would not be subject to public comment at a meeting." [4] The Board member further explained that "[p]ublic comment is reserved for policy and general management issues, and it would be inappropriate to subject personnel items to public comment." As permitted by Section 7(b)(8) of the Open Public Meetings Act, *N.J.S.A.* 10:4–12(b)(8), once the public portion of the June 18, 1996 meeting concluded at 10:15 p.m., the Board met in executive session, during which it "continued the discussion relative to the evaluation and performance of members of the High School coaching staff." Its executive session minutes report as follows:

Upon [the high school principal]'s assurance that he would be personally responsible for improved performance of the coaches under question, or their removal from their coaching position, and [the superintendent of schools]'s support for [the high school principal]'s position as well as a general description of how the

---

[4] As discussed in more detail below, there are two discrete exceptions to the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, that squarely authorize that limitation on public discourse: the statutorily permitted exclusion of discussions of "pending or anticipated litigation" under Section 7(b)(7) of the Act, *N.J.S.A.* 10:4–12(b)(7), and the statutorily permitted exclusion of discussions of any actions concerning the employment of any public employee "unless all the individual employees or appointees whose rights could be adversely affected request in writing that such matter or matters be discussed at a public meeting[,]" as provided in Section 7(b)(8) of the Act, *N.J.S.A.* 10:4–12(b)(8). *See* discussion *infra* at 576–79, 993 A.2d at 823–25.

process of improved performance would take place, the Board of Education approved the inclusion of all recommended coaches for the full academic year on next week's voting agenda.

Although he claimed he would be "out of the country," Besler did attend the June 25, 1996 meeting of the Board. As the first member of the public to speak during the public participation portion of the meeting, he

> reviewed his concerns regarding the vulgar and abusive language used by his daughter's high school coach. He told the Board that he had gone to the administration with the request that the coach be investigated, but was told that this was unable to be done.... He asked why teachers and students are prohibited from using unacceptable language both in the classroom and on the Internet, while coaches are allowed to use abusive [language] on the playing field. He requested that the Board vote individually on the reappointment of each high school coach.

In contrast, two young women/former high school students "spoke in support of the coaches at the high school. They told [B]oard members that they always had coaches who supported them in their endeavors and urged [B]oard support of coaches." Another member of the public stated that he "agreed with Mr. Besler that coaches should not use abusive language. He also said that if a parent has a concern, he should deal directly with the coach about it." That said, that public participant declared that "[h]e supports the coaching staff and feels that they work hard for the children and do an exceptional job of coaching the students as well as of preparing them for life." A teacher within the district "also spoke in support of coaches and said that different types of coaching styles and personalities are needed in order to prepare the students for what they may have to face in the future." She added that "our children are not always going to be nurtured and they must learn to deal with all types of individuals." Yet another member of the public "also spoke in favor of district coaches. He said that all his children have participated in sports in the district. He feels that coaching is a difficult task, and he heartily supports our coaches and the job they do." In sum, the only discordant voice at that Board meeting in respect of the high school coaches belonged to but one speaker: Besler.

When the Board reached the personnel section of its agenda, the high school principal read the following statement to the Board:

> I am recommending that coaches be approved for the 1996–97 school year. Consistent with Board policy, our discussions regarding individuals have taken place in closed session.
>
> The Board of Education has given a clear direction to the secondary schools to undertake a review of our athletic programs. This is the first such comprehensive charge regarding athletics during my tenure as principal. Although the task is challenging, it is a worthy one. In addressing it, we are to maintain the program's many positive aspects and to address concerns expressed by [the B]oard and community members regarding such topics as philosophy, individual team rules, communication and coaches' behavior.
>
> When it develops its annual objectives, the Board links program improvement to the district mission statement and beliefs about what is good for children. We have a record of success in addressing these objectives. Tangible improvement ha[s] come at a secondary level in [a number of areas].
>
> Our district has an excellent reputation for athletics. We want to maintain this tradition. However, in our "new" Athletic Program, it will be clear to all that the development of the child is the reason for interscholastic athletics, and that the behavior of coaches, parents, the student-athlete, and fans should reflect that central focus. It is not only my hope, but my expectation that, with the cooperation of coaches, parents, and students, we will develop an athletic program of which our community can truly be proud.
>
> I am, therefore, asking that all coaches be approved so that we can get on with this necessary and important "work."

The president of the Board noted that the Board had "spent considerable time discussing the athletic program, listening to parental concerns, and listening to administrators regarding how they propose to deal with these concerns." He explained that the Board had "agreed to proceed with the administration's program as outlined in the [high school principal's statement] and will hold the administration accountable for making sure the program stays on track." He thus noted that the Board would "proceed with the recommendation of the administration to approve the coaching positions." In the end, the Board approved a lengthy list of appointments, including the appointment of a total of seventy-seven coaches at the high school; one was the girls' basketball head coach who was the object of Besler's crusade.

Thus scorned, Besler sought to ratchet up his attack. By a letter dated July 24, 1996, Besler, through his counsel, supplemented his earlier Tort Claims Act notice, now also claiming that the superintendent of schools also had "failed and/or refused to supervise, investigate or prevent the conduct of the [coach] in spite of written notice to him of these incidents, causing further damage[,]" and repeating his earlier claim that the Board had "failed and/or refused to implement procedures which would prevent such abusive behavior or conduct, causing further damage[.]" Altogether, then, it was Besler's contention that the coach had verbally and mentally abused his daughter, and that the high school principal, the superintendent of schools and the Board were all liable for failing to supervise, investigate or prevent that alleged conduct. Astonishingly, for these claims and despite absolutely no change in the underlying facts, Besler increased his demand for "reimbursement" from a heady $1,250,000 to the breathtaking sum of $2,000,000.

After making his $2,000,000 "reimbursement" demand, Besler lay dormant until he appeared at a meeting of the Board on November 26, 1996. During the public comment portion of that meeting, he "read a [two-page] letter to [B]oard members concerning the committee that was formed to review the rules of conduct of district coaches." The minutes reflect that, "[b]ased on its makeup, he feels that the committee is biased and would like the [B]oard to investigate the situation further." A Board member "told Mr. Besler that the [B]oard would look into the matter." A review of the letter Besler read shows that he objected to each and every member of that committee: he objected to each Board staff member who was appointed to the committee (because of biases perceived and asserted only by him); he objected to each parent appointed to that committee (because they might have children who wish to play sports); and he objected to each student-athlete appointed to that committee (because "[e]ach one of these students have [sic] some athletic connection with the staff persons they must sit across the table from and make recommendations for"). In short, although no one else objected in any way

to the composition of that committee, not a single appointment to that committee was deemed satisfactory to Besler.

As part of the public comment component of a meeting of the Board held on December 17, 1996, Besler's wife "addressed the [B]oard concerning the attached letter her husband read at last month's [B]oard meeting regarding an investigation into the makeup of the committee to review the rules and conduct of district coaches." In doing so, "[s]he read it again to [B]oard members and requested that the letter be included in the minutes of this evening's meeting." It was so included.

On January 21, 1997, at the next meeting of the Board, Besler again appeared and, again during the public comment period, "raised a hypothetical question with regard to coaching behavior and how he perceives its relation to parameter # 3 of our Strategic Plan." The president of the Board "told Mr. Besler that this issue has been discussed in the past, the [B]oard and administration have already responded to his concerns, and he sees no need to address it again at this time." That response triggered a letter dated the following day, January 22, 1997, from Besler to the high school principal, stating in full:

> I am deeply offended by your discourteous and unprofessional behavior at the school board meeting on January 21, 1997. Since when is it the responsibility of the high school principal to censor a private citizen to keep him from speaking out on an agenda item at a public meeting? I and the rest of the audience were kind enough to let you present your views regarding agenda items which could have been questioned and disputed publicly. The fact that I was not afforded the same consideration by someone in your position of public trust is outrageous.
>
> I have always felt that although we might disagree on specific points, you shared with my wife and me a common respect for parents and caring for children. Unfortunately, your behavior at the meeting and your handling of the most recent incident has seriously undermined this belief.

Besler sent copies of that letter to the superintendent of schools, the assistant superintendent of schools and, through a different assistant superintendent of schools who also served as the Board's secretary, to each member of the Board.

That is the factual predicate that serves as the proper backdrop against which Besler's nascent First Amendment violation claim must be measured.

## B.

On January 28, 1997, Besler again attended a meeting of the Board. As reflected in the minutes, before Besler spoke—but after another member of the public had spoken—the president of the Board "told the audience that the public comment section of the meeting is not intended for personnel discussions, allegations or insinuations about staff performance or behavior, or to be a forum for personal views, in particular, views on matters under litigation." He noted that "[w]hen and if that occurs, the chair reserves the right to cut off any discussion of that nature." The audiotape of the meeting shows that, before Besler was to speak, the president of the Board in fact stated the following:

> Before, before I recognize, ah, the next person, let me, let me just, ah, make some clarifications on this public comment section of our meeting. Ah, this section of the meeting is not, ah, intended for personnel discussions of individuals. It is not intended for allegations or insinuations of, of, about staff behavior or, or staff, ah, performance. Ah, it's for public comment only. Ah, it's not, ah, to allow people a stage or a forum to present their own personal views, particularly views of litigation, of matters under litigation. So, when those kinds of things occur, ah, the chair reserves the right, ah, to cut off any discussion of that nature. Okay.

The president of the Board then acknowledged Besler who, according to the minutes, "again raised the issue regarding the district policy of prohibiting abusive language on the Internet, as well as one of the parameters within our Strategic Plan regarding non tolerance of behavior which diminishes the dignity, self-worth or safety of any individual." As the audiotape recording of that meeting discloses, Besler started to read a prepared statement. He read:

> A few months ago this Board discussed policy for the use of technology in this district. Specifically, you said that the use of harassing or abusive language or any obscenities on the Internet is strictly prohibited. Last week at the meeting of this Board the District Strategic Plan was introduced. Within the parameters it was stated that, "We will not tolerate behavior which diminishes the dignity, self-worth, or safety of any individual." ....

At that point, four raps—presumably of a gavel—are heard and the president of the Board interrupts, stating: "You're out of order. We've heard those comments before, ah, several times from you and, ah, the Board will not entertain those comments tonight." Tellingly, Besler does not state that, when he was interrupted, he was not being repetitive; he does not state that he was not speaking of matters that were not the subject of pending litigation threatened by him; and he does not state that he was addressing a topic other than the one he had raised many times before. Instead, he asked only if he could hand out his written comments. In response, the president of the Board stated that Besler could "hand out, yes, whatever you have to say, but we're not going to entertain those comments." Again, Besler did not protest that he intended to address anything other than the comments he had presented at least seven times before. The president of the Board then solicited "any other comments from the public" and immediately recognized the next speaker.

The entirety of Besler's written comments in fact were appended to the Board's minutes for that meeting. The portion of the written statement that was not read aloud stated as follows:

> My questions to this Board are: Do these guidelines apply to students as well as staff persons employed by this district? Secondly, [d]oes the use of profanity including repeated use of the "F" word constitute abusive language? Lastly, [d]oes the use of abusive language repeatedly, diminish the dignity of an individual?

And, although it has been intimated that the reading of the written statement in full may have marked the end of Besler's comments, that view is rejected by Besler himself. At trial, in response to his own counsel's questions, Besler testified that, once he had read his prepared statement,

> And then, I was gonna talk about, you know, Jennifer, and all that stuff. . . .
>
> Q. And if you hadn't been gaveled, what else would you have talked about?
>
> A. Well, I wanted to lead into the Jennifer situation. I wanted to be more specific about that.

On cross-examination, after confirming that Besler had heard and understood the limitation on the use of the public comment portion of the meeting explained by the Board president, counsel for the Board returned to Besler's transparently disingenuous theme:

Q. Now, the minutes say that a complete copy of your entire comments is attached. You gave him what your comments were going to be and they're now attached?

A. Only my comments, not what else I was going to say, but, yes.

Q. You were going so say more?

A. Yes.

Q. And you told us today that what you wanted to do is you wanted to again talk about the situation with Jennifer and the coach.

A. Yes, I wanted—did I say coach? I wanted to talk about the situation with Jennifer. I'm not sure I said coach.

Q. And that situation involved the [girls' basketball coach], did it not? That's the only situation you have?

A. Yes, you could infer that, yes.

In simpler terms, if Besler had been permitted to continue his comments at the January 28, 1997 Board meeting, he would have acted in a manner entirely consistent with his eight prior appearances before, and several letters to, the Board: he would have launched into yet another tirade against the girls' basketball head coach.

In the end, then, in an eight month period, Besler appeared, either directly or by proxy, and spoke on the same topic—his incessant objections to the girls' basketball head coach—during at least nine separate Board meetings. During that same time period, he sent five separate letters to the Board, again on that same topic. And, he had his counsel send two separate Tort Claims Act notice letters to the Board, demanding first $1,250,000 and then $2,000,000 for "reimbursement." [5]

---

[5] The majority claims that this dissent "disregards [the deferential] standard [of review for jury verdicts] by painting Mr. Besler in the most pejorative light while exalting the actions and motives of the Board." *Ante* at 572 n. 11, 993 A.2d at 821 n. 11. Yet, the majority identifies not one instance in which the facts recounted in this dissent are incorrect or lack proper support in the record. The record facts speak for themselves, and they do so eloquently in opposition to the conclusions reached by the majority.

## C.

Almost a year later, on January 23, 1998, Besler, his wife and his daughter filed a 31-page, twelve-count complaint against the Board, its superintendent of schools, its high school principal, its girls' basketball head coach, his wife, and several others. Of these, only the ninth count—where Besler sought damages against only the Board based on the claim that he was prevented from making his desired presentation before the Board on January 28, 1997, thus depriving him of his constitutional right "to speak freely on a subject of public concern" in violation of 42 *U.S.C.* § 1983— remains viable.[6] At trial, it was conceded that Besler's statement had been interrupted; the only issue thus placed before the jury in this respect was whether that interruption was proper. The verdict sheet inquired: had the Board "proved, by a preponderance of the evidence that it interrupted [Besler]'s speech for a significant or compelling governmental reason?" The jury's unanimous verdict was "no." The jury was then asked if Besler had "proved by a preponderance of the evidence that the restriction upon his freedom of speech caused emotional distress?" The jury unanimously said "yes." Finally, the jury was asked: "What amount of money should be awarded to [Besler] for his pain and suffering resulting from the Board's restriction upon his freedom of speech?" The jury unanimously awarded $100,000.

The trial court denied the Board's motion for judgment notwithstanding the verdict on Besler's Section 1983 claim. On Besler's application, the trial court modified the jury verdict (1) to award pre-judgment interest, (2) to account for the tax effect of receiving the award and prejudgment interest in a lump sum, and (3) to award counsel fees. The judgment entered awarded Besler the

---

6 All other claims that survived until trial and verdict were dismissed by the trial court on post-trial motions. That determination was affirmed by the Appellate Division, and we denied the petition for certification sought by Besler and his daughter. *Besler v. Bd. of Educ. of W. Windsor–Plainsboro Reg'l Sch. Dist.*, 198 *N.J.* 314, 966 *A.2d* 1079 (2009). Therefore, none of the other claims have survived or are the subject of this appeal.

tax-effected/enhanced sum of $170,561 in damages, $78,202 in prejudgment interest, and $307,410 in counsel fees and costs, for a grand total of $556,173. Astonishingly, then, Besler was awarded in excess of one-half million dollars in damages, all because he was told he could not—for the ninth time—hijack the public comment portion of a school board meeting to mount his favorite soapbox and rail about an issue over which he already had threatened to file a $2,000,000 suit.

In an unpublished opinion, the Appellate Division affirmed in part, reversed in part, and remanded for recalculation of Besler's Section 1983 damages. Although it sustained the jury's liability and damages awards, the panel concluded that "there is no statutory or other legal basis for an enhanced award for negative tax consequences of non-economic damages." It proclaimed that, "absent clear direction from our Supreme Court, we decline to accept the trial judge's approach and reverse the award of additional tax offset sums to [Besler]." The remand, thus, was exclusively for a "re-calculation of [Besler]'s damages consistent with" the panel's conclusion in respect of the absence of authority permitting the enhancement of a non-economic damages award to offset for negative tax effects.

## II.

### A.

As noted at the outset, I concur with the majority's reasoning and conclusion in respect of whether, for purposes of imputing liability pursuant to the federal Civil Rights Act, 42 *U.S.C.* § 1983,[7] the president of the Board had the authority to bind the Board for the infringement of a constitutional right, because, "as a matter of law, [the president of the Board] was the final policy-maker for the Board [ ] during the public comment period of the

---

[7] The current version of Section 1983 is directly derived from the venerable Civil Rights Act of 1871, ch. 22, § 1, 17 *Stat.* 13 (1871), a statute adopted to secure and enforce the rights purchased in blood during the Civil War.

Board meeting" on January 28, 1997. *Ante* at 568, 993 *A.*2d at 819.

That said, I must part company with the majority in respect of both of its subsequent conclusions: that "this jury rendered a verdict that is sustainable on the evidence[,]" but that the case must be remanded "for a remittitur of the damages award or, alternatively, for a new trial [because] the damages award is clearly excessive[.]" *Ante* at 575, 993 *A.*2d at 823.

## B.

This appeal arises out of the trial court's denial of the Board's motion for judgment notwithstanding the verdict pursuant to *Rule* 4:40–2(b). In that context, we have explained that,

> Depending on the stage of the trial, three principal motions for judgment are available to the parties: a motion for judgment at the close of plaintiff's case, *R.* 4:37–2(b); a motion for judgment at the close all of the evidence, *R.* 4:40–1; and a motion for judgment notwithstanding the verdict, *R.* 4:40–2(b). All three are governed by the same evidential standard:
>
>> [I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. . . .
>
> [*Estate of Roach v. TRW, Inc.,* 164 *N.J.* 598, 612, 754 *A.*2d 544 (2000) (quoting *Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 415, 690 *A.*2d 575 (1997) (quoting *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969))) (citations and quotations omitted in original).]
>
> [*Verdicchio v. Ricca,* 179 *N.J.* 1, 30, 843 *A.*2d 1042 (2004).]

The task, then, is to determine whether, viewing the trial evidence in the light most favorable to Besler and giving him the benefits of all inferences that reasonably and legitimately can be deduced from that evidence, Besler has made out a cause of action under Section 1983 for a purported First Amendment violation. He has not.

The Supreme Court of the United States—the final arbiter in respect to this uniquely federal statute—has made clear that "the first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' of

the United States." *Martinez v. California*, 444 *U.S.* 277, 284, 100 *S.Ct.* 553, 558, 62 *L.Ed.*2d 481, 488 (1980) (quoting *Baker v. McCollan*, 443 *U.S.* 137, 140, 99 *S.Ct.* 2689, 2692, 61 *L.Ed.*2d 433, 439 (1979)) (internal quotation marks, editing marks and footnote omitted). Therefore, as a threshold matter, one must address the nature of the right asserted by Besler to determine whether it is worthy of protection under Section 1983.

Both the First Amendment to the United States Constitution, *U.S. Const.* amend. I,[8] and paragraphs 6 and 18 of Article I of the New Jersey Constitution, *N.J. Const.* art. I, ¶¶ 6, 18,[9] guarantee freedom of speech to our citizens. That right reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 270, 84 *S.Ct.* 710, 721, 11 *L.Ed.*2d 686, 701 (1964) (citing *Terminiello v. Chicago*, 337 *U.S.* 1, 4, 69 *S.Ct.* 894, 895–96, 93 *L.Ed.* 1131, 1134 (1949); *De Jonge v. Oregon*, 299 *U.S.* 353, 365, 57 *S.Ct.* 255, 260, 81 *L.Ed.* 278, 284 (1937)). That right—

---

[8] It provides that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people ... to petition the Government for a redress of grievances." Although, by its explicit terms, that limitation applies to the federal government, "[t]he First Amendment restriction on governmental interference with free speech was made applicable to the states by the Fourteenth Amendment to the United States Constitution." *Hamilton Amusement Ctr. v. Verniero*, 156 *N.J.* 254, 264, 716 *A.2d* 1137 (1998) (citing *U.S. Const.* amend. XIV, § 1; *44 Liquormart, Inc. v. Rhode Island*, 517 *U.S.* 484, 516, 116 *S.Ct.* 1495, 1515, 134 *L.Ed.*2d 711, 736 (1996); *Cantwell v. Connecticut*, 310 *U.S.* 296, 303, 60 *S.Ct.* 900, 903, 84 *L.Ed.* 1213, 1218 (1939)).

[9] Paragraph 6 of Article I of the New Jersey Constitution commands that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech[.]" *N.J. Const.* art. I, ¶ 6. Paragraph 18 of that same Article states that "[t]he people have the right freely ... to make known their opinions to their representatives, and to petition for redress of grievances." *N.J. Const.* art. I, ¶ 18.

the right to speak freely—was firmly embedded during the infancy of our national consciousness as an independent nation:

> Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.
>
> [*Whitney v. California*, 274 *U.S.* 357, 375–76, 47 *S.Ct.* 641, 648, 71 *L.Ed.* 1095 (1927) (Brandeis, J., concurring) (footnote omitted).]

Freedom of speech is a much cherished and dearly paid-for liberty. It is not—and, in an ordered democracy, cannot be—a license childishly to babble, rant or needlessly offend; limits on that right can and are imposed, as reasonable restrictions on speech remain consonant with the constitutional guarantees. Thus, it consistently has been central to First Amendment jurisprudence

> [t]hat the freedom of speech which is secured by the Constitution does not confer an absolute right to speak, without responsibility, whatever one may choose, or an unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse this freedom; and that a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to incite to crime, disturb the public peace, or endanger the foundations of organized government and threaten its overthrow by unlawful means, is not open to question.
>
> [*Whitney, supra,* 274 *U.S.* at 371, 47 *S.Ct.* at 646–47, 71 *L.Ed.* 1095 (citation omitted), *overruled on other grounds, Brandenburg v. Ohio,* 395 *U.S.* 444, 449, 89 *S.Ct.* 1827, 1830–31, 23 *L.Ed.*2d 430, 435 (1969) (branding, as unconstitutional,

sedition "statute[s] which, by [their] own words and as applied, purport[ ] to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action").]

This Court likewise has recognized limits on the constitutional guarantee of freedom of speech. As recently explained in *State v. DeAngelo*, 197 *N.J.* 478, 485–86, 963 *A.*2d 1200 (2009),

> not all speech is equally protected. For example, government may impose stricter regulations on commercial speech than on non-commercial speech. *See Metromedia, Inc. v. City of San Diego*, 453 *U.S.* 490, 513, 101 *S.Ct.* 2882, 2894, 69 *L.Ed.*2d 800, 818 (1981); *State v. Miller*, 83 *N.J.* 402, 412 n. 5, 416 *A.*2d 821 (1980). Additionally, in determining the limits, if any, that may be placed on protected speech on public property, different standards may apply "depending on the character of the property at issue." *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 *U.S.* 37, 44, 103 *S.Ct.* 948, 954, 74 *L.Ed.*2d 794, 804 (1983). First Amendment jurisprudence recognizes three types of forums: "the traditional public forum, the public forum created by government designation, and the [non-public] forum." *Frisby v. Schultz*, 487 *U.S.* 474, 479–80, 108 *S.Ct.* 2495, 2500, 101 *L.Ed.*2d 420, 428 (1988) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 *U.S.* 788, 802, 105 *S.Ct.* 3439, 3449, 87 *L.Ed.*2d 567, 580 (1985)). Public streets, parks, and sidewalks are traditionally public forums that occupy a " 'special position in terms of First Amendment protection,' ... [in that] the government's ability to restrict expressive activity is very limited." *Boos v. Barry*, 485 *U.S.* 312, 318, 108 *S.Ct.* 1157, 1162, 99 *L.Ed.*2d 333, 343 (1988).

That said, "members of the public have free speech rights on other types of government property and in certain other government programs that share essential attributes of a traditional public forum." *Pleasant Grove City v. Summum*, 555 *U.S.* ——, ——, 129 *S.Ct.* 1125, 1132, 172 *L.Ed.*2d 853, 862 (2009). In this respect, "a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at ——, 129 *S.Ct.* at 1132, 172 *L.Ed.*2d at 862 (citation omitted). "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral." *Id.* at ——, 129 *S.Ct.* at 1132, 172 *L.Ed.*2d at 863 (citation omitted).

The public comment portion of a school board meeting is precisely the type of government-created forum designed for the discussion of certain subjects described in *Pleasant Grove City, supra.* At present, Section 7(a) of New Jersey's Open Public Meetings Act, *N.J.S.A.* 10:4–12(a), specifically requires, in relevant

part, that "all meetings of public bodies shall be open to the public at all times" and that, at those public meetings, "a board of education shall be required to set aside a portion of every meeting ... for public comment on any ... school district issue that a member of the public feels may be of concern to the ... school district." [10] Having "create[d] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects[,]" the Board was entitled to "impose restrictions on speech that are reasonable and viewpoint-neutral." *Pleasant Grove City, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 1132, 172 *L.Ed.*2d at 862–63.

In support of its restriction of Besler's repetitive allegations concerning his daughter's high school basketball coach, the Board tendered two grounds for exception to the Open Public Meetings Act's mandate of public participation: first, that Besler's persistent and unremitting attack on the girls' basketball head coach implicated "pending ... litigation ... in which the public body is, or may become a party[,]" *N.J.S.A.* 10:4–12(b)(7); and, second, that Besler's complaints concerning the girls' basketball head coach "involve[d] the employment, appointment, termination of

---

[10] When this controversy arose, the Open Public Meetings Act required that "all meetings of public bodies shall be open to the public at all times." *L.* 1975, *c.* 231, § 7(a) (codified as *N.J.S.A.* 10:4–12(a)). It contained no direct allowance of a right to public comment; on the contrary, it expressly provided that "[n]othing in this act shall be construed to limit the discretion of a public body to permit, prohibit or regulate the active participation of the public at any meeting[,]" *ibid.,* a limitation that remains in the Act today. The statutory definition of a "public body" was broad enough to include school boards. *See L.* 1975, *c.* 231, § 3(a) (codified as *N.J.S.A.* 10:4–8(a)). Section 7(a) of the Act was amended in 2002—after the events in this case—to limit the requirement to set aside a portion of a public meeting for public comment only in respect of a meeting of a "municipal governing body." *See L.* 2002, *c.* 80, § 1 (codified as *N.J.S.A.* 10:4–12(a)); *see also Deegan v. Perth Amboy Redev. Agency,* 374 *N.J.Super.* 80, 86 n. 1, 863 *A.*2d 416 (App.Div.2005) (limiting *N.J.S.A.* 10:4–12(a) to "municipal governing body" and excluding from its reach "other municipal bodies such as a redevelopment agency"). The Act was again amended in 2008—eleven years after the events giving rise to this appeal—to extend the obligation to provide a period of public comment to meetings of boards of education. *L.* 2008, *c.* 14, § 1 (codified at *N.J.S.A.* 10:4–12(a)). It is this latest iteration that has been cited.

employment, terms and conditions of employment, evaluation of the performance of, promotion or disciplining of any specific prospective public officer or employee or current public officer or employee employed or appointed by the public body," *N.J.S.A.* 10:4–12(b)(8).[11]

No doubt, because Besler's claims implicated both exceptions (b)(7) and (b)(8) to the Open Public Meetings Act's mandate of public participation, the question then becomes whether the restrictions in fact imposed by the president of the Board were "reasonable and viewpoint-neutral." *Pleasant Grove City, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 1132, 172 *L.Ed.*2d at 863. They undoubtedly were. Before Besler began to speak [12]—and given the Board's familiarity-by-repetition with Besler's personal crusade—the president of the Board set forth reasonable restrictions on *all* speakers: that a speaker could not engage in "personnel discussions of individuals[;]" that a speaker could not raise "allegations or insinuations ... about staff behavior or ... staff ...

---

[11] It bears noting that, since 2001, school board members also are subject to a State-imposed code of ethics under the School Ethics Act, *N.J.S.A.* 18A:12–21 to –34. In respect of the issues presented in this appeal, a school board member is obliged to "hold confidential all matters pertaining to the schools which, if disclosed, would needlessly injure individuals or the schools." *N.J.S.A.* 18A:12–24.1(g). It goes without saying that Besler's continuous public airing of his private grievances against the girls' basketball head coach needlessly injured both the coach and the high school, and the Board would have been required to limit it.

[12] No meaningful weight can be placed on the fact that, at the January 28, 1997 Board meeting, another member of the public spoke before the president of the Board explained the limitations on the use of the public comment period immediately before Besler was recognized. The undisputed fact is that, by his repeated harangues, Besler and his pet cause were well known to the Board and, by Besler's own admission, he intended to bang once again on the same repetitive drum. Therefore, it simply makes common sense that the president of the Board would publish the speech limitations before the person who constantly abused the speech privilege started to speak; it is always best to close the barn door *before* the horse escapes, and there is no record proof that either of the persons who spoke before Besler did on January 28, 1997 had ever abused that privilege, much less to the extent and frequency Besler had.

performance[;]" and that a speaker could not usurp the public comment period as "a stage or a forum to present their own personal views, particularly views of litigation, of matters under litigation." *All* speakers were warned that "when those kinds of things occur ... the chair reserves the right ... to cut off any discussion of that nature." [13]

Those restrictions, which are firmly rooted in the now well-settled exceptions to the Open Public Meetings Act, were reasonable in their scope and neutral in their viewpoint. The salient proof of their reasonableness and neutrality lies in the uncontested fact that Besler was permitted to submit his statement in writing to be made part of the minutes—as he had in the past; thus, the restriction imposed was not on the *content* of Besler's message, but on the medium of expression. Furthermore, since its adoption in 1975, the Open Public Meetings Act has specifically provided that "[n]othing in this act shall be construed to limit the discretion of a public body to permit, prohibit or regulate the active participation of the public at any meeting[.]" *N.J.S.A.* 10:4–12(a). *See Fuhrmann v. Bd. of Educ. of Borough of Middlesex,* 93 *N.J.A.R.*2d (EDU) 416 (N.J.Adm.,1993) (concluding that total prohibition of public comment period at board of education meeting was lawful because "boards of education have the lawful authority, and need the operating flexibility, to regulate public participation at board meetings"). Indeed, if the Open Public Meetings Act vests discretion in a public body to "permit, prohibit or regulate" the public comment portion of a meeting, how can a restriction that forbids trampling on areas specifically excluded from the Open Public Meetings Act's reach be unreasonable or fixed on any specific viewpoint?

---

[13] The majority asserts that nothing in the Open Public Meetings Act authorizes a governmental body to restrict public comment by one who has threatened to and taken steps to sue that governmental body. *Ante* at 574 n. 13, 993 *A.*2d at 822 n. 13. The notion that a party opponent can abuse the public comment period of a public meeting to rant about something for which he has demanded $2,000,000 in "reimbursement" does not merit a response and cheapens the fundamental free speech right at issue here.

At its core, Besler and, by accepting his claim, the majority confuse the fundamental difference between liberty and license. Although our constitutional provisions safeguard our citizens' liberty to speak freely, that does not mean that citizens have the license to speak as, when and where they choose. The exercise of a right carries with it the obligation to exercise it responsibly. And the prohibitions against curtailing freedom of speech cannot be so trivialized to protect every single expression in a one-man personal vendetta. Confronted with Besler—who continually sought to impose his personal animosities and acrimonious views on the Board—and its countervailing obligations to the public, the Board was placed squarely in a quandary: whether to allow Besler selfishly to impose his personal agenda—time and again—on all others, those who both attend and staff those evening meetings.[14] That is a Hobson's choice, no choice at all; "for the presiding officer of a public meeting to allow a speaker to try to hijack the proceedings, or to filibuster them, would impinge on the First Amendment rights of other would-be participants." *Eichenlaub v. Twp. of Indiana*, 385 *F*.3d 274, 281 (3d Cir.2004).

When the evidence in this case is viewed in the light most favorable to Besler, and giving him the benefit of all reasonable inferences, one, and only one, conclusion obtains: as a matter of law, the Board's imposition of reasonable and viewpoint-neutral restrictions—not an outright ban—on Besler's participation during the public comment portion of the Board's January 28, 1997 meeting was, of necessity, lawful. Therefore, judgment should be entered in the Board's favor on the ninth and sole remaining count

---

[14] Under the Education Law, board of education meetings "shall be called to commence not later than eight P.M. of the designated day but, if a quorum be not present at the time for which the meeting is called, the member or members present may recess the meeting to a time not later than nine P.M. of said day[.]" *N.J.S.A.* 18A:10–6. As the minutes of the meetings made part of this record reveal, the earliest any of the Board meetings started was 8:00 p.m., and some of them lasted until 11:50 p.m. In those circumstances, allowing one person to monopolize the public comment portion of the meeting is not just discourteous to others, it is plainly unacceptable.

of Besler's complaint. To the extent the majority reaches a contrary conclusion, I respectfully dissent.

## C.

Assuming Besler somehow were to vault the proof obstacles that lie in the way to fixing liability on the Board, his proofs of damages were so insignificant as to be no proof at all. Therefore, even if one were to conclude that Besler has presented a cognizable and actionable violation of his constitutional right to free speech, his failure to present competent proof of injury dooms his cause of action.

The majority correctly notes that "[u]nder 42 *U.S.C.* § 1983, a constitutional violation, standing alone, does not entitle a plaintiff to compensatory damages." *Ante* at 576, 993 *A.*2d at 823 (citations omitted). It properly notes that "[a] plaintiff in a § 1983 case can only recover compensatory damages for a constitutional violation if he proves that he suffered an 'actual injury.'" *Ante* at 576, 993 *A.*2d at 823 (citations and footnote omitted). It recognizes that "[e]motional distress can constitute an actual injury under § 1983[,]" but that "a plaintiff must show a causal connection between the constitutional violation and the emotional distress—the injury" because "[e]motional-distress damages are not presumed; they must be proved." *Ante* at 576, 993 *A.*2d at 824 (citations omitted). Although the majority acknowledges that "compensatory damages for emotional distress, in the amount awarded here, must be based on more than de minimis mental anguish, or fleeting embarrassment, or mere shock and bewilderment[,]" *ante* at 580, 993 *A.*2d at 826, it fails to identify any specific damages and simply finds the jury award to be "clearly excessive that it constitutes 'a miscarriage of justice'" and that "even the most generous consideration of the testimony from Besler's perspective does not support the damages awarded." *Ante* at 580, 993 *A.*2d at 826.

Even in the somewhat permissive Section 1983 setting, "[t]he cardinal principle of damages in Anglo–American law is that of

compensation for the injury caused to plaintiff by defendant's breach of duty." *Carey v. Piphus,* 435 *U.S.* 247, 254–55, 98 *S.Ct.* 1042, 1047, 55 *L.Ed.*2d 252, 259 (1978) (citation, internal quotation marks and emphasis omitted). Focusing on the types of damages Besler asserted here, it is clear that, "although mental and emotional distress caused by the denial of [a constitutional right] is compensable under § 1983, . . . neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury *actually* was caused." *Id.* at 264, 98 *S.Ct.* at 1052, 55 *L.Ed.*2d at 265 (emphasis supplied). Stated differently, "[a] plaintiff in a section 1983 case cannot recover for emotional distress unless he or she presents evidence of 'actual injury.' There is no right to damages other than nominal ones for violation of a constitutional right unless actual injury is proven." *Bolden v. Southeastern Pa. Transp. Auth.,* 21 *F.*3d 29, 34 (3d Cir.1994) (citations omitted). Although, "[i]n light of the purpose of the civil rights laws [there is] no reason to require that a specific type of evidence be introduced to demonstrate injury in the form of emotional distress[,]" *id.* at 36, at a minimum there must be proof of "actual injury." *Ibid.*

The sum total of Besler's proof of injury in respect of the January 28, 1997 meeting of the Board was as follows: "every time I came to a board meeting, or back from a board meeting, I mean, I was depressed. There was like-I just couldn't believe it. I was bewildered. I couldn't understand it. I was sick to my stomach." Yet, Besler presented no independent evidence of depression, that he lost sleep, that his work or family life was adversely affected, or that he suffered any cognizable injury causally related to the alleged deprivation of his constitutional rights on January 28, 1997.[15] The operative rule is clear:

---

[15] Because Besler's claim of a deprivation of his constitutional rights arose only in respect of being "gaveled down" on January 28, 1997, none of the other evidence tendered in respect of any of the other interactions Besler had with the Board is causally linked to his substantive claim and, hence, is not relevant. On

"The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable. Yet even in the field of constitutional torts *de minimis non curat lex.* Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise[.]"

[*Suppan v. Dadonna,* 203 *F.*3d 228, 235 (3d Cir.2000) (*quoting Bart v. Telford,* 677 *F.*2d 622, 624 (7th Cir.1982)).]

That time-honored doctrine—de minimis non curat lex, or that "[t]he law does not concern itself with trifles[,]" *Black's Law Dictionary* 496 (9th ed. 2009)—is comfortably part of New Jersey's jurisprudence. *See, e.g., Resnick v. E. Brunswick Twp. Bd. of Educ.,* 77 *N.J.* 88, 106, 389 *A.*2d 944 (N.J.1978) (citing, with approval, application of doctrine in *Southside Estates Bapt. Church v. Bd. of Trustees,* 115 *So.*2d 697, 699 (Fla.1959)); *Wartman v. Swindell,* 54 *N.J.L.* 589, 590, 25 *A.* 356 (E. & A. 1892) (holding doctrine inapplicable to intentional trespass to land); *Kelly v. County of Monmouth,* 380 *N.J.Super.* 552, 560 n. 2, 883 *A.*2d 411 (App.Div.2005) (citing *Wartman, supra,* with approval); *Paternoster v. Shuster,* 296 *N.J.Super.* 544, 559, 687 *A.*2d 330 (App.Div.1997) (explaining that "[t]he doctrine of de minimis 'has been considered to apply where no damage is implied by law from the wrong, and only trifling or immaterial damage results therefrom' ") (*quoting Schlichtman v. N.J. Highway Auth.,* 243 *N.J.Super.* 464, 472, 579 *A.*2d 1275 (Law Div.1990)).

Lacking evidence of anything other than an uncorroborated belly-ache or that he sustained an actual injury as a result of the alleged deprivation of his constitutional rights on January 28, 1997, Besler's damages claim must fail in its entirety.[16] *See Biggs*

---

the contrary, because Besler testified that he reacted to *all* Board meetings—not just the single one where he claims his constitutional rights were infringed—in exactly the same way, the record lacks any proof whatsoever of damages causally linked to his claimed cause of action.

16 It is also fundamentally relevant that Besler voluntarily and intentionally thrust himself into this debate, airing publicly—time and again—his minor grievances. In that context, Besler's tummy-ache or his other vague gastrointes-

*v. Dupo,* 892 *F.*2d 1298, 1304 (7th Cir.1990) (holding that "when the injured party provides the sole evidence of mental distress, he must reasonably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements") (quoting *Rakovich v. Wade,* 819 *F.*2d 1393, 1399 n. 6 (7th Cir.1987), *vacated on reh. in banc on other grounds,* 850 *F.*2d 1180, *cert. denied,* 488 *U.S.* 968, 109 *S.Ct.* 497, 102 *L.Ed.*2d 534 (1988) (internal quotation and editing marks omitted)); *Nekolny v. Painter,* 653 *F.*2d 1164, 1172–73 (7th Cir.1981) (stating that "[a] single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated' ... is not enough to establish injury even when the statement is considered along with the facts of this case"), *cert. denied,* 455 *U.S.* 1021, 102 *S.Ct.* 1719, 72 *L.Ed.*2d 139 (1982). *See also Horina v. City of Granite City,* 538 *F.*3d 624, 637 (7th Cir.2008) (explaining that, "[a]lthough [the fact finder] may award compensatory damages to a successful § 1983 plaintiff, it may not award damages to account for the abstract value of a constitutional right[;]" that a fact finder "may award the plaintiff damages only if he can prove that the denial of his constitutional rights resulted in an actual injury[;]" that "[t]he fact that the monetary value of the particular injury is difficult to ascertain-as is often the case when the injuries asserted are humiliation, distress, and other harms associated with the denial of a right— does not preclude an award of damages[;]" but that "the plaintiff must nevertheless show that he actually suffered those injuries, and where no injury is present, no compensatory damages may be

---

tinal maladies cannot serve as proper damages for a freedom of speech abridgment; Besler's paltry damages claims diminish and devalue the inherent dignity of the right he asserts. *See, e.g., Agosto–de–Feliciano v. Aponte–Roque,* 889 *F.*2d 1209, 1218 (1st Cir.1989) (en banc) (explaining that liability for retaliatory actions arises only when acts are "sufficiently severe to cause reasonably hardy individuals" to curtail right of expression). In light of his constant and unbridled attacks of others—including an unreasonable, unjustified and unsupported attack on the innocent spouse of Besler's principal victim—Besler's overly sensitive attitude towards how he is perceived or how is he deserves to be treated stands in stark contrast.

awarded" (citations, internal quotation and editing marks omitted)).

Besler's proof of damages related to the claimed deprivation of his constitutional rights on January 28, 1997 were not just illusory, they were non-existent. Given that utter failure of proof, the correct result is to enter judgment in favor of the Board. Because, in addition to determining incorrectly that Besler adduced sufficient proof of liability, the majority allows Besler an unmerited "second bite of the apple" in respect of his damages claim, I respectfully dissent.[17]

## III.

For the foregoing reasons, and although I concur exclusively in respect of the majority's legal conclusion that the president of the Board acted in such a way as to impute liability for his actions to the Board, I respectfully dissent.

Justice HOENS joins in this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN and WALLACE—5.

*Concurring in part/dissenting in part*—Justices RIVERA-SOTO and HOENS—2.

---

[17] The majority's conclusion that Besler has proven a Section 1983 violation and should be entitled to prove up his damages has a collateral but far more insidious effect: as a "prevailing party," Besler may be entitled by statute to "a reasonable attorney's fee as part of the costs[.]" 42 *U.S.C.* § 1988(b). As the now-reversed-and-remanded judgment shows, the award of attorney's fees was more than three times the amount of base compensatory damages the majority soundly condemned as "clearly excessive" and "a miscarriage of justice." Ironically, all of the litigation subsequent to the entry of the judgment may simply add to that total.